

JUDGE COTE

12 CV 3497

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CIVIL ACTION NO.

RECEIVED
MAY 03 2012
U.S.D.C. S.D. N.Y.
CASHIERS

MARILYN B. ROSENFARB, Individually And )
On Behalf of All Others Similarly Situated, )
)
                         Plaintiff, )
vs. )
)
AOL, INC., TIM ARMSTRONG, )
ARTHUR T. MINSON, )
)
                       Defendants )

**CLASS ACTION COMPLAINT**

**FOR VIOLATION OF**
**FEDERAL SECURITIES LAW**

**<u>JURY TRIAL DEMANDED</u>**

**CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT**

    This is a federal class action on behalf of sellers of the securities of AOL, Inc. ("AOL" or

the "Company") between August 11, 2011 and April 9, 2012, inclusive (the "Class Period"),

seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

    Plaintiffs, by their attorneys, on behalf of themselves and the class they seek to represent,

for their Consolidated Class Action Complaint (the "Complaint"), make the following allegations

against defendants AOL, Tim Armstrong, and Arthur T. Minson.

**JURISDICTION AND VENUE**

    1.    The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the

1934 Act and SEC Rule 10b-5.

    2.    This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §1331 and §27 of the 1934 Act.

3.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b).  AOL maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

4.      In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including the mail, the internet, telephone communications and the facilities of national securities exchanges.

## PARTIES

### A.      Plaintiff

5.      Plaintiff Marilyn B. Rosenfarb, as set forth in the accompanying certification, incorporated by reference herein, realized reduced value from the sale of AOL common stock during the Class Period due to artificially low prices and has been thereby damaged.

### B.      Defendants

6.      Defendant **AOL, Inc.** is organized under the laws of the state of Delaware and maintains its principal place of business at 770 Broadway, New York, New York 10003.  As described in further detail herein, AOL is a web services company that offers a suite of brands and offerings for the worldwide audience.

7.      Defendant Tim Armstrong is currently Chairman and Chief Executive Officer of AOL and was throughout the Class Period.

8.      Defendant Arthur T. Minson is currently AOL's Chief Financial Officer and President of AOL Services and was during the Class Period.

9.      The defendants referenced in ¶¶7-8 are referred to herein as the "Individual Defendants."

10.     The Individual Defendants were at all relevant times during the Class Period controlling persons of AOL within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act. Because of the Individual Defendants' positions with the Company, they had access to undisclosed information about its business, operations, balance sheets, accounting policies, operational trends, financial condition, and present and future business prospects through, among other ways, access to internal corporate documents (including the Company's operating plans, budgets, forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management meetings and meetings of the board and committees thereof, and through reports and other information provided to them in connection therewith.

11.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Individual Defendants identified above. Each of the Individual Defendants, by virtue of their high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest level and was privy to confidential proprietary information concerning the Company and its business, operations, prospects, growth, finances and financial condition as alleged herein. These defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein (including SEC filings, press releases and other publications), were aware of or recklessly disregarded that materially false or misleading statements were being

issued regarding the Company, and nonetheless approved or ratified these statements in violation of the federal securities laws.

12.     As officers, directors and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC, traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, earnings, management, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.     The Individual Defendants participated in the drafting, preparation and/or approval of the various public and shareholder and investor reports and other communications concerning AOL that are complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and the omissions therefrom, and were aware of their materially false and misleading nature.  Because of their positions with AOL, each of the Individual Defendants had access to positive undisclosed information about AOL's business prospects and financial condition and performance as particularized herein, and knew (or recklessly disregarded) that these positive facts rendered the statements complained of herein materially false and misleading.

14.     The Individual Defendants, because of their positions of control and authority as officers and controlling persons of the Company, were able to and did control the content of the

-4-

various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each of the Individual Defendants was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports, releases and statements detailed herein and are therefore primarily liable for the representations contained therein.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who sold the securities of AOL between August 11, 2011 and April 9, 2012, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

15. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, AOL common shares were actively traded on the NYSE. As of April 18, 2012, the Company had over 93.451 million shares of common stock outstanding. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by AOL or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

17.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

18.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.    whether the federal securities laws were violated by defendants' acts as alleged herein;

    b.    whether statements made by defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations and management of AOL; and

    c.    to what extent the members of the Class have sustained damages and the proper measure of damages.

19.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to

individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

20.     During the Class Period, defendants devised and carried out a scheme that deceived shareholders by improperly failing to disclose their intent of selling a majority of the Company's valuable patents (the "Patent Portfolio") as well as failing to disclose sufficient relevant information from which the significant value of the Patent Portfolio could be discerned. These failures caused selling shareholders during the Class Period to sell at artificially low prices, while at the same time benefitting defendants, who bought shares through the stock repurchase program. By reason of their positions with AOL, the Individual Defendants were in possession of material non-public information concerning the financial condition, liquidity, future prospects of AOL and the true value of the Patent Portfolio.

21.     The Patent Portfolio covered a wide range of Internet-based activities in areas such as email, Web-search rankings, Web browsers, instant messaging and video conferencing. From as early as 2009, defendants recognized the value of AOL's Patent Portfolio. For example, at the time of the Time Warner spinoff of AOL, in 2009, Armstrong and others at AOL spent significant time negotiating the patent portfolio with Time Warner. Once split from Time Warner, defendants "set up" the Patent Portfolio. Indeed, defendant Armstrong referred to the Patent Portfolio as "beachfront property" and considered it one of the "top three" patent portfolios in the marketplace.

22.     Transactions occurred in the marketplace that provided significant indicia to defendants as to the value of the Patent Portfolio. For example, on June 30, 2011, Nortel Networks Corp announced that it concluded a successful auction of its entire remaining patent

portfolio and patent applications.  The winning bidder was a consortium consisting of Apple Inc.,

Microsoft Corp., Research in Motion Ltd., and Sony Corp.  A July 1, 2011 article in

BLOOMBERG, entitled "Apple Joins Microsoft, RIM in $4.5 Billion Buy of Nortel Patents,"

quoted David Descoteaux, managing director of Lazard Ltd., Nortel's investment banker, in part,

as follows:

> The price and the bidding show that companies considered the patents vital
> to their strategic goals, including the need to defend themselves from
> patent lawsuits and to roll out future products, Descoteaux said.

> "This has woken up the world to what IP means and how companies think
> about ways of monetizing intellectual property," he said.

23.     Throughout most of the Class Period, however, defendants failed to disclose

information from which the value of the Patent Portfolio could be discerned.

24.     Defendants also failed to disclose that they had implemented a "clear strategy and

operational plan" to sell the Patent Portfolio.  In this regard, THE AM LAW DAILY reported on

April 9, 2012, that Wachtell, Lipton, Rosen & Katz and Finnegan, Henderson, Farabow, Garrett

& Dunner advised AOL on the sale of the Patent Portfolio.  The article also noted that it had

reported "last summer on AOL's retention of Wachtell.  AOL declined to say at the time why it

had retained the firm . . . ."  Indeed, defendant Armstrong told ADWEEK by email, "There is no

deal on the table, no proposed deal, and both parties are on retainer with us and we work with

them.  Our strategy hasn't changed and we are moving faster than ever on it."

25.     Despite defendants' knowledge of the significant value of the Patent Portfolio and

their intent to sell it, defendants failed to disclose this relevant information in the Company's

public filings with the SEC during the Class Period.  Defendants' misrepresentations and

omissions of an existing reality - systematically and materially repressing the Company's stock

price, resulting in shareholders selling, and the Company buying, AOL stock at artificially low

prices. As noted by AOL's General Counsel Julie Jacobs, "[t]he outsiders that were valuing

these [did] not understand patents and didn't understand what we had."

26.     Generally, the trading price of a share of stock reflects the composite value of a

company's net assets. As evidenced by the stock climbing from approximately $18.42 to $26.35,

the sale of the Patent Portfolio added approximately $8 per share. Had defendants properly

disclosed information from which the value of the Patent Portfolio could be discerned - as well as

defendants plan to sell it - the announcement of the sale of the Patent Portfolio would not have

caused a significant increase in the price of the shares. .

## DEFENDANTS, MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

27.     On August 11, 2011, defendants issued a press release announcing a $250 million

stock repurchase authorization. The release stated in part, the following:

> "We believe this stock repurchase makes sense for both our company and
> our shareholders," said Tim Armstrong, Chairman and CEO. "We are
> continuing the disciplined execution of our strategy and have confidence in
> our future growth prospects."
>
> "This announcement highlights both our strong balance sheet and free cash
> flow generation," said Artie Minson, CFO. "We believe this is a unique
> opportunity to invest in our company."
>
> Under the program, AOL is authorized to repurchase up to $250 million of
> its outstanding shares of common stock from time to time over the next 12
> months. The timing and amount of any shares repurchased will be
> determined by the Company's management based on its evaluation of
> market conditions, the trading price of the stock and other factors. The
> repurchases may be made on the open market, in block trades or otherwise
> and may include derivative transactions. The repurchase program may be
> suspended or discontinued at any time.

28.     The defendants' statements were materially false and misleading as they failed to

disclose favorable and material nonpublic information. The true facts, which were known by the

defendants but concealed from the investing public during the Class Period, were as follows:

a.      Defendants had committed to a plan to sell AOL's valuable Patent Portfolio;

b.      Defendants had initiated an active program to locate a buyer for the Patent

Portfolio; and

c.      Defendants were actively marketing the Patent Portfolio.

29.     On November 2, 2011, during the Company's third quarter 2011 Earnings Call,

defendant Minson stated, in part, the following:

> Finally, as you know, our Board of Directors authorized the company to
> repurchase up to $250 million of common stock on August 10th and since
> then we have repurchased approximately 9.7 million shares at an average
> price of $13.39, for $130 million in aggregate, bringing our shares
> outstanding to approximately 97 million shares. Clearly we believe in our
> opportunity, our strategy, and the asset value underlying both.

The Earnings Release of the same date disclosed essentially the same facts.

30.     On November 2, 2011, defendants also filed the Company's 10-Q for the third

quarter 2011:

> If we are unable to successfully implement our strategic plan and grow the
> earnings generated by our online advertising services, we may need to
> reassess our cost structure and/or seek other financing alternatives to fund
> our business. We may also consider other financing alternatives, as a result
> of our recent acquisition activities.  If it is necessary to seek other
> financing alternatives, our ability to obtain future financing will depend
> on, among other things, our financial condition and results of operations as
> well as the condition of the capital markets or other credit markets at the
> time we seek financing.  Currently we do not have a credit rating from the
> credit rating agencies, so our access to the capital markets may be limited.
> As part of our ongoing assessment of our business and availability of
> capital and to enhance our liquidity position, we have divested of certain
> assets and product lines and may consider divesting of additional assets or
> product lines.

31.     In connection with the Company's repurchase program, defendants disclosed in

the third quarter 2011 10-Q, in part, the following:

> As of November 2, 2011, the Company repurchased a total of 9.7 million shares at a weighted average price of $13.39 per share under this program. Shares repurchased under the program are recorded as treasury stock on the Company's consolidated balance sheet. The repurchase program may be suspended or discontinued at any time. The shares repurchased during the three and nine months ended September 30, 2011 were not the result of an accelerated share repurchase agreement and did not result in any derivative transactions. Management has not made a decision on whether shares purchased under this program will be retired or reissued.

32.    The defendants' statements were materially false and misleading as they failed to disclose favorable and material nonpublic information. The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

      a.    Defendants had committed to a plan to sell AOL's valuable Patent Portfolio;

      b.    Defendants had initiated an active program to locate a buyer for the Patent Portfolio; and

      c.    Defendants were actively marketing the Patent Portfolio.

33.    On December 21, 2011, Starboard Value LP wrote a letter to defendant Armstrong, stating, in part, the following:

> At the current price, we believe that AOL's market value reflects only the value of the Company's highly profitable Access business and its net cash position. This implies that investors are ascribing no value to AOL's media assets, including its Advertising Network, Search business, and extensive portfolio of Display properties. We believe that this valuation discrepancy is primarily due to the Company's massive operating losses in its Display business, as well as continued concern over further acquisitions and investments into money-losing growth initiatives like Patch.

34.    On December 21, 2001, AOL issued a response to Starboard's letter, stating, in part, the following:

> AOL has a clear strategy and operational plan to provide our consumers and customers with exceptional value, which we believe will lead to the

creation of shareholder value. Our Board and management team remain firmly committed to creating value for all shareholders and we will continue to aggressively execute on our strategy in 2012 as we continue the turnaround of AOL.

35.     On January 11, 2012, defendant Minson participated at the Needham Growth

Conference. During the conference, he stated, in part, the following:

> **Artie Minson** - AOL Inc. - CFO and President, AOL Services
> You know, we have obviously done some significant M&A from Huffington Post and goviral. So it's been a busy year on that standpoint, but we are always looking for ways to be more efficient and look at ways to optimize the assets that we have --...
>
> **Laura Martin** - Needham & Co. - Analyst
> So it sounds like asset sales, those are kind of behind us. We shouldn't expect to see too many more of those?
>
> **Artie Minson** - AOL Inc. - CFO and President, AOL Services
> You know, we are always -- look, we always say, you know, right price, we will have a conversation with different people.
>
> **Laura Martin** - Needham & Co. - Analyst
> Don't sell your house.
>
> **Artie Minson** - AOL Inc. - CFO and President, AOL Services
> But there is nothing on the horizon right now. I would say -- I would just point out the other thing we did is when the stock took a hit back in the summer, we pretty quickly, within 24 hours of the initial drop, we put in a pretty meaningful buyback program particular and relative to the equity value of the Company at that point in time, and we executed over half of that in a quarter. So I think we have shown whether it was cost-cutting, taking $500 million out in the first year or selling $650 million of assets or returning capital to shareholders through a buyback, we have shown we are willing to make some pretty bold moves on that end.

36.     Defendant Minson's statements during the conference were materially false and

misleading because he failed to disclose favorable and material nonpublic information. The true

facts, which were known by the defendants but concealed from the investing public during the

Class Period, were as follows:

a.      Defendants had committed to a plan to sell AOL's valuable Patent Portfolio;

b.       Defendants had initiated an active program to locate a buyer for the Patent

Portfolio; and

c.       Defendants were actively marketing the Patent Portfolio.

37.     On December 5, 2011, defendant Armstrong participated at the UBS Media and

Communications Conference.  During the conference, he stated, in part, the following:

**Tim Armstrong** - AOL, Inc. – CEO
So, I feel really good about the business overall this year, and I think as an
investor, I'm a big personal investor in the Company. I'm a top 20
shareholder.  We did a lot this year, and hopefully next year we're going to
do more. But I think AOL is well positioned in where the future of the
Internet is going. And, again, you may not -- you can't say we don't have a
clear strategy. You may not like the strategy, but we have a clear strategy,
and we're going to continue to execute against it.

**Brian Pitz**
Great.  I'll just ask one more and then turn it over to the audience again.
You had announced a fairly substantial buyback, back when the stock took
a pretty major hit. I think it was 26% of the outstanding float at the time.
That was a significant change from the way you and Artie had kind of
viewed the business previously.  What changed there, and how should we
think about your buyback plans going forward?

**Tim Armstrong** - AOL, Inc. - CEO
I think it became a no-brainer. From a standpoint of where we could put
our resources and money, there is a time period that says -- a lot of our
Board of Directors bought stock.  We announced a huge buyback.  We
were we announced the results of the buyback we had done so far during
the Q3 earnings, and I think from that standpoint, we bought back roughly
7% of the Company. So if you take a giant step back from AOL as a
whole, I would just point out the following things. One is we started with
strategy structure, cost structure. Strategy has been the same. It continues
to be the same. And we're going to keep hammering on it. The structure of
the Company is getting simpler over time, and it's going to continue to get
simpler over time. And on the cost structure side, we basically removed
$500 million plus and we are continuing to work on the cost structure side
of things overall, and then, separately, I think from an investor standpoint,
we have really tried to do what we think is smart with M&A investing,
and also buying back shares. So we are setting the Company up that as the
results get better, investors that are with us now are going to get rewarded

-13-

for it. 80% of the shares are held by institutional, mostly long-term investors, and we've shrunk the outstanding shares meaningfully. And I won't comment on what we're doing right now with the buyback, but the Q3 results, I think, were -- we showed people how serious we were about it.

38.     Defendant Armstrong's statements were materially false and misleading as they failed to disclose favorable and material nonpublic information. The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

    a.     Defendants had committed to a plan to sell AOL's valuable Patent Portfolio;

    b.     Defendants had initiated an active program to locate a buyer for the Patent Portfolio; and

    c.     Defendants were actively marketing the Patent Portfolio.

39.     On February 1, 2012, during the Company's fourth quarter 2011 Earnings Call, defendant Minson stated in part, the following:

> [W]e continue to repurchase stock during the quarter at very attractive prices. We bought back 3.3 million shares since our last call and over 12% of our shares outstanding since our Board authorized to repurchase of stock in August.
>
> As a reminder, we have approximately $72 million left in the original authorization.

40.     On February 24, 2012, defendants filed the Company's 10-K for the year ended 2011:

> Forecasts of future cash flows are dependent on many factors, including future economic conditions and the execution of our strategy. We expect to fund our ongoing working capital, investing and financing requirements,

including future repurchases of common stock, through our existing cash balance and cash flows from operations.

* * *

Currently we do not have a credit rating from the credit rating agencies, so our access to the capital markets may be limited. As part of our ongoing assessment of our business and availability of capital and to enhance our liquidity position, we have divested of certain assets and product lines and may consider divesting of additional assets or product lines.

41.   In connection with the Company's repurchase program, defendants disclosed in the 2011 10-K, in part, the following:

Repurchases have been and will be made in accordance with applicable securities laws in the open market or in private transactions and may include derivative transactions. As of February 1, 2012, we repurchased a total of 13.0 million shares at a weighted average price of $13.62 per share (approximately $178 million) under this program.

42.   The defendants' statements were materially false and misleading as they failed to disclose favorable and material nonpublic information. The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

a.   Defendants had committed to a plan to sell AOL's valuable Patent Portfolio;

b.   Defendants had initiated an active program to locate a buyer for the Patent Portfolio; and

c.   Defendants were actively marketing the Patent Portfolio.

43.   Starboard Value LP one of the largest shareholders of AOL Inc. wrote a letter to the AOL board of directors on February 24, 2012, stating in part, the following:

> AOL owns a robust portfolio of extremely valuable and foundational intellectual property that has gone unrecognized and underutilized. This portfolio of more than 800 patents broadly covers internet technologies with focus in areas such as secure data transit and e-commerce, travel navigation and turn-by-turn directions, search-related online advertising, real-time shopping, and shopping wish list, among many others.

> Since our initial public involvement in AOL, we have been approached by multiple parties specializing in intellectual property valuation and monetization, some of whom believe that (i) a significant number of large internet-related technology companies may be infringing on these patents, and (ii) AOL's patent portfolio could produce in excess of $1 billion of licensing income if appropriately harvested and monetized.

44.    As a result of the Starboard letter, defendants were forced to provide partial disclosures to the market. In response to Starboard's February 24, 2012 letter to the AOL board of directors, the Company issued a press release, stating in part, the following:

> Our Board of Directors and management team remain firmly committed to creating value for all shareholders. We have a valuable patent portfolio and several months ago, prior to Starboard's first letter, the AOL Board of Directors authorized the start of a process, and hired advisors, to realize the value of certain non-strategic patents. AOL has a clear plan to provide our consumers and customers with exceptional value, which we believe will lead to the creation of shareholder value. We will continue to aggressively execute and innovate on our strategy as we continue the turnaround of AOL.

45.    On March 13, 2012, defendant Armstrong participated in Barclays Internet Connect Conference. During the conference, Armstrong stated, in part, the following:

> **Anthony DiClemente** – Barclays

> Okay. There's been some recent discussion out there about AOL's patent portfolio. I wonder if you could talk a little bit about your -- give us your view on the value of your patent portfolio and how do you think you might realize that value or monetize that value?

> **Tim Armstrong -** AOL Inc. – Chairman & CEO

> Yes. So the patent portfolio is something we started looking at last probably September and we had kicked off a process last September

because of the interest in IP and patents and we had a lot of incoming interest in AOL's patent portfolio.

So to basically summarize AOL's patent portfolio, it's beachfront property in East Hampton. I don't know why I'm going to the Hampton's, but – it's basically extremely valuable. It is unique in the fact that it has some of the foundation patents for the Internet inside of it. There's roughly 160 or so patent portfolios in the marketplace right now. I would consider our patent portfolio to be probably top three if we were to take it out to the marketplace.

And when you think about patents, patents basically drop into a few different buckets. One is there's basically a set of standard patents that people have been licensing and getting revenue off of, so that's the Kodak situation where most of their patents basically were -- had been licensed out already and there were 30 or 40 major companies that had licensed their patent portfolio.

So one is that's a great revenue stream, but if you want to transact on that patent portfolio it has less of a value in terms of selling it. And then you look at something more like Nortel, which had probably less licensees of it and more unique kind of what they call foundational patents and it. So AOL's -- we specifically -- when we were spinning out of Time Warner this was a huge negotiation and I spent a lot of personal time on it and some of our folks did because we knew at some point in the future the IP was going to be valuable so we negotiated for a few months on the way out of Time Warner and got our patent portfolio set up.

And when you think about basically the opportunity to use the patent portfolio or some of our IP around it, it basically comes down to the following things. One is we have to protect our Company on a go-forward basis from an operating standpoint.

Two is you have to measure your portfolio against what's in the marketplace today and what is foundational versus non-foundational in terms of the patents. And we have a very foundational patent portfolio. We have -- about half of our patent portfolio -- what?

46.     At no time during the conference, did defendant Armstrong disclose the

following:

        a.     Defendants had committed to a plan to sell AOL's valuable Patent Portfolio;

b.      Defendants had initiated an active program to locate a buyer for the Patent

Portfolio; and

c.      Defendants were actively marketing the Patent Portfolio.

## THE TRUE FINANCIAL CONDITION OF AOL IS REVEALED

47.     On April 9, 2012, the Company issued a press release announcing the $1.056

billion sale of the Patent Portfolio.  The release stated in part, the following:

> [T]hat the Company has entered into a definitive agreement to sell over 800 of its
> patents and their related patent applications to Microsoft Corporation (NASDAQ:
> MSFT) ("Microsoft") and to grant Microsoft a non-exclusive license to its
> retained patent portfolio for aggregate proceeds of $1.056 billion in cash.

48.     In addition to the foregoing, the April 9, 2012 release also quoted Brad Smith,

General Counsel and Executive Vice President, Legal and Corporate Affairs, Microsoft, in part,

as follows "[t]his is a valuable portfolio that we have been following for years and analyzing in

detail for several months."

49.     On the news, AOL's stock price skyrocketed over 43%, closing at $26.40, from

the prior day's close of $18.42 per share – in the single trading day, on very high trading

volume of almost 26 million shares.

a.      **Violations of SEC Regulations**

50.     Defendants were required by Item 7 of Form 10-K and Item 2 of Form 10-Q,

Management's Discussion and Analysis of Financial Condition and Results of Operations

("MD&A") to furnish information required by Item 303 of Regulation S-K [17 C.F.R. 229.303].

In discussing results of operations, Item 303 of Regulation S-K requires the registrant to:

> *Liquidity.* Identify any known trends or any known demands, commitments,
> events or uncertainties that will result in or that are reasonably likely to result in
> the registrant's liquidity increasing or decreasing in any material way. If a

> material deficiency is identified, indicate the course of action that the registrant
> has taken or proposes to take to remedy the deficiency. Also identify and
> separately describe internal and external sources of liquidity, and briefly discuss
> any material unused sources of liquid assets.

The Instructions to Paragraph 303(a) further states that "[l]iquidity generally shall be discussed

on both a long-term and short-term basis."

51.     In addition, the SEC, in its May 18, 1989 Interpretive Release No. 34-26831, has

indicated that registrants should employ the following two-step analysis in determining when a

known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item

303 of Regulation S-K:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty
> is both presently known to management and is reasonably likely to have a material
> effect on the registrant's financial condition or results of operations.

52.     Despite defendants intent to monetize the Patent Portfolio in the near future, which

was likely to result in a very substantial increase in the Company's liquidity, defendants failed to

disclose, as required by SEC rules, either the Patent Portfolio as a material unused source of

liquid assets or the plan to create liquidity from the sale of the Patent Portfolio.

**b.     The Information was Material to Investors**

53.     The information was material to investors. According to the AICPA's, AT

Section 701 <u>Management's Discussion and Analysis</u>:

> In the context of an MD&A presentation, the concept of materiality encompasses
> both material omissions (for example, the omission of trends, events, and
> uncertainties that are currently known to management that are reasonably likely to
> have material effects on the entity's financial condition, results of operations,
> liquidity, or capital resources) and material misstatements in MD&A, both of
> which are referred to herein as a misstatement. Assessing the significance of a
> misstatement of some items in MD&A may be more dependent upon qualitative
> than quantitative considerations. Qualitative aspects of materiality relate to the
> relevance and reliability of the information presented (for example, qualitative
> aspects of materiality are considered in assessing whether the underlying
> information, determinations, estimates, and assumptions of the entity provide a
> reasonable basis for the disclosures in the MD&A).

54.     As discussed herein, the disclosures contained material omissions of trends, events, and uncertainties related to defendants intent to monetize AOL's valuable Patent Portfolio. Indeed, when defendants finally revealed the sale of the Patent Portfolio, investors reacted, skyrocketing AOL stock to $26.35.

## CAUSATION AND ECONOMIC LOSS

55.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market developed a course of conduct that maintained an artificially low stock and operated as a fraud or deceit on Class Period sellers of AOL's stock by misrepresenting the Company's liquidity and future prospects. Over a period of approximately nine months, defendants improperly repressed the Company's stock price, allowing defendants to purchase over $178 million of the Company shares at artificially low prices. When defendants' prior misrepresentations and fraudulent conduct was revealed and apparent to investors, shares of AOL increased precipitously eliminating the prior artificial deflation in the price of AOL's shares. As a result, plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

56.     By improperly characterizing the Company's liquidity and future prospects, defendants presented a misleading image from which to value AOL securities. During the Class Period, defendants failed to disclose that they (a) had committed to a plan to sell AOL's valuable Patent Portfolio; (b) had initiated an active program to locate a buyer for the Patent Portfolio; and (c) were actively marketing the Patent Portfolio. Defendants' omissions caused and maintained an artificial value of AOL's stock price allowing defendants to purchase AOL stock at artificially low prices throughout the Class Period and until the truth was ultimately revealed to investors.

57.     Defendants' false and materially misleading statements had the intended effect of causing AOL's shares to trade at artificial levels throughout the Class Period reaching a Class Period low of $11.25 per share on September 22, 2011. As a result, the Company was able to purchase AOL stock at artificially low prices.

58.     On April 9, 2012, however, as investors learned the truth about the Company, and learned that defendants had failed to disclose the value of its Patent Portfolio and its intent sell it, shares of the Company skyrocketed. Defendants' belated disclosures had an immediate and positive impact on the price of AOL shares.

59.     These belated revelations also evidenced defendants' prior falsification of AOL's true value. As investors and the market ultimately learned, defendants had understated AOL's liquidity and future prospects.

60.     As a direct result of investors learning the truth about the Company on April 9, 2012, AOL's stock price skyrocketed over 43%, increasing $7.98 per share, from the prior day's close of $18.42 per share – in the single trading day, on very high trading volume of almost 26 million shares traded – as compared to the S&P 500, which lost $15.25, closing at $1,382.20 on that day. The previous day's trading volume of AOL was 861,100 shares. This dramatic share price increase, eradicated the artificial deflation from AOL's share price, causing real economic loss to investors who sold AOL securities during the Class Period.

61.     The increase in the price of AOL's securities at the end of the Class Period was a direct result of the nature and extent of defendants' fraud being revealed to investors and to the market. The timing and magnitude of AOL's stock price increase on April 9, 2012 – as compared to the rest of the financial marketplace - negates any inference that the losses suffered by plaintiff and the other members of the Class was caused by changed market conditions,

macroeconomic or industry factors or even Company-specific facts unrelated to defendants' fraudulent conduct.

62.     The economic loss, *i.e.* damages suffered by plaintiff and other members of the Class, was a direct result of defendants' fraudulent scheme to artificially repress the price of AOL's stock.

## ADDITIONAL SCIENTER ALLEGATIONS

63.     As alleged herein, defendants acted with scienter in that each defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding AOL, their control over, and/or receipt and/or modification of AOL's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning AOL, participated in the fraudulent scheme alleged herein.

64.     Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because: (i) it deceived the investing public regarding AOL's liquidity and future prospects; (ii) it enabled defendants to artificially repress the price of AOL shares; (iii) it enabled AOL to buy approximately two hundred million dollars of AOL shares while in possession of material positive non-public information about the Company; and (iv) it caused plaintiff and other members of the Class to sell AOL common stock at artificially repressed prices.

### Applicability of Presumption of Reliance:

-22-

## Fraud-On-The-Market Doctrine

65.    At all relevant times, the market for AOL's securities was an efficient market for the following reasons, among others:

(a)    AOL's stock met the requirements for listing, and was listed and actively traded on the NYSE national market exchange, a highly efficient and automated market;

(b)    As a regulated issuer, AOL filed periodic public reports with the SEC;

(c)    AOL regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    AOL was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

66.    As a result of the foregoing, the market for AOL securities promptly digested current information regarding AOL from all publicly available sources and reflected such information in AOL's stock price.   Under these circumstances, all sellers of AOL's common stock during the Class Period suffered similar injury through their sale of AOL common stock at artificially repressed prices and a presumption of reliance applies.

## NO SAFE HARBOR

67.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements there were no

meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of AOL who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

68.    Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of SEC filings by AOL, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

-24-

## FIRST CLAIM
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

69.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

70.     During the Class Period, the Company and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding AOL's liquidity and future prospects; (ii) enable the defendants to artificially repress the price of AOL shares; (iii) enable AOL to purchase approximately $200 million of AOL shares at repressed prices while in possession of material positive non-public information about the Company; and (iv) cause plaintiff and other members of the Class to sell AOL securities at artificially low prices.  In furtherance of this unlawful scheme, plan and course of conduct, the defendants, jointly and individually (and each of them) took the actions set forth herein.

71.     The defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the sellers of the Company's securities in an effort to maintain artificially low market prices for AOL's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. The defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below. The defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal positive material information about the business, liquidity, and future prospects of AOL as specified herein.

72.     The defendants employed devices, schemes and artifices to defraud, while in possession of material, positive non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to deceive investors of AOL's true value which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about AOL and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the sellers of AOL securities during the Class Period.

73.     The defendants' primary liability, and controlling person liability, arises from the following facts: (i) Armstrong and Minson were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) Armstrong and Minson, by virtue of their responsibilities and activities as a senior officer and/or director of the Company were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) Armstrong and Minson, enjoyed significant personal contact and familiarity with the other defendants and were advised of and had access to other members of the Company's management team, internal reports  and other data and information about the Company's finances, operations and sales at all relevant times; and (iv) Armstrong and Minson were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

74. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. These material misrepresentations and/or omissions were done knowingly or with reckless disregard for the purpose and effect of concealing AOL's financial condition and future business prospects from the investing public and supporting the artificially repressed price of its common stock. As demonstrated by the defendants' omissions and misstatements of the Company's the business, liquidity, and future prospects of AOL throughout the Class Period, the defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

75. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of AOL securities was artificially repressed during the Class Period. In ignorance of the fact that market prices of AOL's publicly-traded securities were artificially repressed, and relying directly or indirectly on the false and misleading statements made by the defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material positive information that was known to or recklessly disregarded by the defendants but not disclosed in public statements by the defendants during the Class Period, plaintiff and the other members of

the Class sold AOL securities during the Class Period at artificially low prices and were damaged thereby. At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the value of the Patent Portfolio and defendants' intent to sell it, which were not disclosed by the defendants, plaintiff and other members of the Class would have realized greater value from the sale of their AOL securities.

76.     By virtue of the foregoing, defendants AOL, Armstrong and Minson have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

77.     As a direct and proximate result of the defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against Individual**
**Defendants**

78.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

79.     The Individual Defendants, acted as controlling persons of AOL within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had

unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

80.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

81.    By virtue of their positions as controlling persons of AOL, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their sales of the Company's common stock during the Class Period.

**WHEREFORE,** plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiff as lead plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as lead counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 3, 2012

**Rosenfarb Law Firm**

Ronald G. Rosenfarb
825 Third Avenue, 4th Floor
New York, NY 10022
(855) 415-5455
ronald.rosenfarb@rosenfarblawfirm.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT TO SECURITIES LAWS

MARILYN ROSENFARB _____ (name) ("Movant") declares, as to the claims asserted under the federal securities law, that:

1. Movant has fully reviewed the facts of the complaint filed in this action alleging violations of the securities laws, Movant adopts the allegations of the complaint, and Movant retains the firm of The Rosenfarb Law Firm, to pursue such action on a contingent fee basis.

2. Movant did not purchase securities of AOL, Inc. at the direction of counsel in order to participate in a private action under federal securities laws.

3. Movant is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. During the Class Period, Movant was the beneficiary of executed transactions in the securities of AOL, Inc. Growth Fund of America ("Growth Fund") sold 344,909 shares of AOL during the Class Period. Movant was a shareholder of Growth Fund during the Class Period. See attached schedule.

5. In the last three years, Movant has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

6. Movant will not accept payment for serving as a lead plaintiff beyond her pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct

Dated: MAY 1 _____, 2012

_____

Movant Signature

MARILYN ROSENFARB

Printed Name

MorganStanley
SmithBarney

Ref:

**Reserved Client**
**Financial Management Account**

March 1 - March 31, 2012

Page 6 of 21

**MARILYN B ROSENFARB**

Account number

## Mutual funds

An investment in a money market fund is neither insured nor guaranteed by the FDIC or any other government agency. Although money market funds seek to preserve the value of your investment at $1.00 per share, there can be no assurance that will occur and it is possible to lose money should the fund value per share fall. Moreover, in some circumstances money market funds may be forced to cease operations when the value of a fund drops below $1.00 per share. In that event, the fund's holdings would be liquidated and distributed to the fund's shareholders. This liquidation process could take up to one month or more. During that time, these funds would not be available to you to support purchases, withdrawals, and if applicable, check writing or ATM debits from your account.

Certain mutual funds may not be transferable to other broker-dealers.  For further information, please refer to the fund's Prospectus or call your Financial Advisor.

Yield is the current distribution annualized, divided by the fund's net asset value at the end of the statement period.  Distributions may consist of income, capital gains or the return of capital.  Distributions and current dividend for funds are based upon information provided by an outside vendor and are not verified by us.  "Tax-Based Cost vs. Current Value" is being provided for information purposes only.  "Cash Distributions (since inception)" when shown, may reflect distributions on positions no longer held in the account, and may not reflect all distributions received in cash due to but not limited to the following: investments made prior to 1/1/89, asset transfers, recent activity and certain adjustments made in your account.  "Total Purchases vs. Current Value" is provided to assist you in comparing your "Total purchases" excluding reinvested distributions, with the current value of the fund's shares in your account.  "Fund Value Increase/Decrease" reflects the difference between your total purchases and the current value of the fund's shares, plus cash distributions since inception.

| Number of shares | Description | Symbol | Date acquired | Cost | Share cost | Current price | Current value | Unrealized gain/(loss) | Net Value Increase/ Decrease | Yield | Anticipated Income (annualized) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 794.303 | BARON GROWTH FUND | BGRFX | 03/03/03 | $ 16,706.89 | $ 21.03 | $ 55.61 | $ 44,171.19 | $ 27,464.30* LT | | | |
| 794.303 | Total Purchases | | | 16,706.89 | 21.03 | 55.61 | 44,171.19 | 27,464.30 | | | |
| 122.401 | Reinvestments to date | | | 5,962.54 | 48.713 | 55.61 | 6,806.72 | 844.18 LT | | | |
| 916.704 | Tax-based Cost vs. Current Value | | | 22,669.43 | 24.729 | | 50,977.91 | 28,308.48 | | .082 | 32.06 |
| | Cash distributions (since inception) | | | | | | | | 2,387.78 | | |
| | Total Purchases vs. Current Value | | | 16,706.89 | | | 50,977.91 | | 34,271.02 | | |
| | Fund Value Increase/Decrease | | | | | | | | 36,658.80 | | |
| 1,081.081 | GROWTH FUND OF AMERICA CLASS C | GFACX | 03/03/03 | 20,000.00 | 18.50 | 31.65 | 34,216.21 | 14,216.21* LT | | | |
| 1,081.081 | Total Purchases | | | 20,000.00 | 18.50 | 31.65 | 34,216.21 | 14,216.21 | | | |
| 126.468 | Reinvestments to date | | | 4,013.52 | 31.735 | 31.65 | 4,002.71 | (10.81) LT | | | |
| 1,207.549 | Tax-based Cost vs. Current Value | | | 24,013.52 | 19.886 | | 38,218.92 | 14,205.40 | | .075 | 28.98 |
| | Total Purchases vs. Current Value | | | 20,000.00 | | | 38,218.92 | | 18,218.92 | | |
| | Fund Value Increase/Decrease | | | | | | 38,218.92 | | 18,218.92 | | |
| | **Total mutual funds (Tax based)** | | | **148,852.46** | | | **88,186.83** | **0.00** LT | **.06** | | |
| | **Total Fund Value Increase/Decrease** | | | | | | | **4,92,513.98** LT | **84,877.72** | | |

AO 440 (Rev. 12/09)  Summons in a Civil Action

JUDGE COTE

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| Marilyn B. Rosenfarb | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) |
| Tim Armstrong | ) |
| _____ | ) |
| *Defendant* | ) |

12 CV    3497

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Tim Armstrong
C/O AOL, Inc.
770 Broadway
New York, NY 10003

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Ronald G. Rosenfarb
825 3rd Avenue, 4th Floor
New York, NY 10003

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

RUBY J. KRAJICK

CLERK OF COURT

MAY 0 3 2012

Date: _____

_____
Signature of Clerk or Deputy Clerk

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT JUDGE COTE

for the

Southern District of New York

Marilyn B. Rosenfarb ⟩
_____ ⟩
*Plaintiff* ⟩
v. ⟩
Arthur T. Minson ⟩
_____ ⟩
*Defendant* ⟩

# 12 CV        3497

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Arthur T. Minson
c/o AOL, Inc.
770 Broadway
New York, NY 10003

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Ronald G. Rosenfarb
825 3rd Avenue, 4th Floor
New York, NY 10003

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

MAY 0 3 2012

Date: _____

RUBY J. KRAJICK

*CLERK OF COURT*

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the
Southern District of New York

JUDGE COTE

| | |
|---|---|
| Marilyn B. Rosenfarb | ) |
| *Plaintiff* | ) |
| v. | ) |
| AOL, Inc. | ) |
| *Defendant* | ) |

Civil Action No. **12 CV  3497**

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  AOL, Inc.
770 Broadway
New York, NY 10003

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Ronald G. Rosenfarb
825 3rd Avenue, 4th Floor
New York, NY 10003

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

RUBY J. KRAJICK

*CLERK OF COURT*

Date:  MAY 0 3 2012

_____
*Signature of Clerk or Deputy Clerk*