# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE AOL, INC. REPURCHASE OFFER LITIGATION** | **12 Civ. 3497 (DLC)** |
| BARBARA KEELING, On Behalf of Herself and All Others Similarly Situated, | **AMENDED CLASS ACTION COMPLAINT**<br><br>FOR VIOLATION OF FEDERAL SECURITIES LAW |
| Plaintiffs, | <u>**JURY TRIAL DEMANDED**</u> |
| v. | |
| AOL, INC., TIM ARMSTRONG, ARTHUR T. MINSON, |  |
| Defendants. | |

## AMENDED SECURITIES CLASS ACTION COMPLAINT

Lead Plaintiff Barbara Keeling, by her attorneys and on behalf of herself and the class she seeks to represent, makes the following allegations against defendants AOL, Inc. ("AOL" or "the Company"), Tim Armstrong and Arthur T. Minson:

1.    This is a class action pursuing remedies under the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of persons or entities that sold AOL common stock between August 11, 2011 and April 9, 2012, inclusive (the "Class Period").

2.    This case arises from a plan executed by AOL; AOL's Chairman and Chief Executive Officer during the Class Period, Tim Armstrong; and AOL's Chief Financial Officer and President of AOL Services during the Class Period, Arthur T. Minson, to effect an AOL common stock repurchase program at artificially deflated prices while concealing material information about AOL's assets and liquidity.

3.     During the Class Period, defendants deceived AOL shareholders by purposefully concealing the true value of the Company's assets, obscuring the Company's future prospects and liquidity, and exploiting the market's ignorance of the defendants' true dealings. Defendants knew the true value of the Company because they were engaged in a concerted undisclosed plan to sell a valuable portfolio of the Company's legacy patents (the "Patent Portfolio") to Microsoft, Inc. ("Microsoft"), which would result in proceeds of more than $1 billion – far more than the value at which the patents had been carried at on AOL's books: $4 million.   However, defendants kept their plan to monetize the Patent Portfolio a secret from the market during the Class Period in order to keep AOL stock at an artificially depressed price, which enabled them to exploit the information imbalance through a stock repurchase program that they authorized at roughly the same time.

4.     Through the stock repurchase program, AOL bought more than 13.8% of the Company's outstanding shares by March 31, 2012, spending a total of $209 million for 14.8 million shares (at an average weighted price of $14.11 per share).   Had defendants timely disclosed to the market the material inside information on which AOL was trading, AOL would have had to pay an average of $26.44 per share, which is the market's valuation of AOL's common stock  (90-day average) following full disclosure of AOL's plan to sell its Patent Portfolio for more than $1 billion.   Accordingly, timely disclosure to the market would have driven the market price of AOL stock up to actual value, and repurchasing 13.8% of AOL's float, or 14.8 million shares, would have cost AOL $391.3 million (well over the $250 million spending ceiling the Board authorized for the repurchase program).

5.     Defendants withheld from the market material information about the actual value of the Patent Portfolio and information from which the Patent Portfolio's value could be

ascertained. Defendants omitted from their statements, and affirmatively misrepresented, the fact that AOL had already committed to a plan to sell its Patent Portfolio to Microsoft, and was actively bringing to fruition the sale in secret, while benefiting from the artificially low price of AOL stock by repurchasing stock from AOL shareholders at approximately half the shares' value. Defendants' actions violated their disclosure duties to AOL shareholders, and violated Sections 10b and 20(a) of the Exchange Act, and SEC Rule 10b-5.

## JURISDICTION AND VENUE

6. The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 27 of the 1934 Act.

8. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). AOL maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

9. In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including the mail, the internet, telephone communications and the facilities of national securities exchanges.

## PARTIES

A. **Plaintiff**

10. Plaintiff Barbara Keeling was a shareholder of AOL stock who sold such stock during the Class Period, as set forth below, and as set forth in her certification filed in this action, a copy of which is attached hereto as Exhibit A.

| Date Sold | # Shares | Price Per Share | Sale Proceeds |
|---|---|---|---|
| 11/04/2011 | 200 | $15.80 | $3,160.00 |
| 12/15/2011 | 42 | $13.75 | $577.50 |
| 12/15/2011 | 100 | $13.75 | $1,375.00 |
| 12/15/2011 | 100 | $13.75 | $1,375.00 |
| 12/15/2011 | 358 | $13.75 | $4,922.50 |
| 12/15/2011 | 400 | $13.75 | $5,500.00 |
| 12/15/2011 | 42 | $13.75 | $577.50 |
| 12/15/2011 | 200 | $13.75 | $2,750.00 |
| 12/15/2011 | 200 | $13.75 | $2,750.00 |
| 12/15/2011 | 100 | $13.75 | $1,375.00 |
| 12/15/2011 | 100 | $13.75 | $1,375.00 |
| 12/15/2011 | 200 | $13.75 | $2,750.00 |
| 12/15/2011 | 58 | $13.75 | $797.50 |
| 12/15/2011 | 100 | $13.75 | $1,375.00 |
| 12/15/2011 | 100 | $13.75 | $1,375.00 |
| 12/15/2011 | 42 | $13.75 | $577.50 |
| 12/15/2011 | 100 | $13.75 | $1,375.00 |
| 12/15/2011 | 100 | $13.75 | $1,375.00 |
| 12/15/2011 | 100 | $13.75 | $1,375.00 |
| 12/15/2011 | 100 | $13.75 | $1,375.00 |
| 12/15/2011 | 100 | $13.75 | $1,375.00 |
| 12/15/2011 | 300 | $13.75 | $4,125.00 |
| 12/15/2011 | 100 | $13.75 | $1,375.00 |
| 12/15/2011 | 100 | $13.75 | $1,375.00 |
| 12/15/2011 | 200 | $13.75 | $2,750.00 |
| 12/15/2011 | 200 | $13.75 | $2,750.00 |
| 12/15/2011 | 200 | $13.75 | $2,750.00 |
| 12/15/2011 | 100 | $13.75 | $1,375.00 |
| 12/15/2011 | 100 | $13.75 | $1,375.00 |
| 12/15/2011 | 100 | $13.75 | $1,375.00 |
| 12/15/2011 | 42 | $13.75 | $577.50 |
| 12/15/2011 | 58 | $13.75 | $797.50 |
| 12/15/2011 | 100 | $13.75 | $1,375.00 |
| 12/15/2011 | 158 | $13.75 | $2,172.50 |
| 12/19/2011 | 400 | $14.26 | $5,704.00 |
| 12/19/2011 | 400 | $14.26 | $5,704.00 |
| 12/19/2011 | 200 | $14.26 | $2,852.00 |
| 12/20/2011 | 300 | $14.68 | $4,404.00 |
| 1/6/2012 | 100 | $16.17 | $1,617.00 |
| 4/9/2012 | 200 | $25.74 | $5,148.00 |
| **TOTAL** | **6,200** | | **$89,089.00** |

Ms. Keeling realized reduced value from her sale of AOL common stock during the Class Period due to the artificial depression of AOL's stock price during the Class Period, and has been thereby damaged.

**B.     Defendants**

11.     Defendant AOL is a Delaware Corporation that maintains its principal place of business at 770 Broadway, New York, New York 10003.  As described in further detail herein, AOL is an internet services company.  During the Class Period, AOL repurchased its common stock in the following quantities:

| Period | Total Number of Shares Repurchased |
|---|---|
| August 2011 | 394,000 |
| September 2011 | 4,644,800 |
| October 2011 | 4,643,413 |
| November 2011 | 1,615,900 |
| December 2011 | 1,461,174 |
| January 2012 | 279,301 |
| February 2012 | 0 |
| March 2012 | 1,788,200 |
| April 2012 | 0 |
| **TOTAL:** | **14,826,788** |

12.     Defendant Tim Armstrong is currently, and was throughout the Class Period, Chairman and Chief Executive Officer of AOL.  As of April 19, 2012, Armstrong held 3,814,855 shares of AOL common stock, or approximately 4% of the common stock then-outstanding, making Mr. Armstrong the largest insider holder of the Company's common stock.

13.     Defendant Arthur T. Minson is currently AOL's Chief Operating Officer. Throughout the Class Period, Minson was AOL's Chief Financial Officer and President of AOL Services.  As of April 19, 2012, Minson held 290,072 shares of AOL common stock, making Mr. Minson the second largest owner of the Company's common stock.

14.     The defendants referenced in ¶¶ 12-13 are referred to herein as the "Individual Defendants."

15.     The Individual Defendants were at all relevant times during the Class Period controlling persons of AOL within the meaning of Section 20(a) of the Exchange Act.  Because of the Individual Defendants' positions with the Company, they had access to undisclosed information about its assets (including the Patent Portfolio), and present and future business prospects through, among other means, access to internal corporate documents.

16.     The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company and were directly involved in day-to-day operations concerning the Patent Portfolio and its planned disposition, as alleged herein.  The Individual Defendants made affirmative misrepresentations, as described herein, and were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein (including SEC filings, press releases and other publications), were aware of or recklessly disregarded that materially false or misleading statements were being issued regarding the Company, and nonetheless approved or ratified these statements in violation of the federal securities laws.

17.     As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC, traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, assets, future prospects and liquidity, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful, complete and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

18.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons or entities who sold AOL common stock during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

19.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, AOL common shares were actively traded on the NYSE.  The Company had 106.97 million shares of common stock outstanding on April 18, 2011, and more than  93.45 million shares outstanding on April 18, 2012   The total volume of AOL common stock traded during the Class Period was 331,184,200.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by AOL or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

20.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

21.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations and management of AOL; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

23.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members  of the  Class  to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

24.     During the Class Period, defendants carried out a plan to deceive Class members by improperly failing to disclose AOL's plan to sell the Patent Portfolio as well as failing to disclose sufficient information from which the significant value of the Patent Portfolio could be ascertained.  These failures caused Class members to sell their AOL common stock during the Class Period at artificially low prices, to the benefit of AOL, which bought shares at artificially low prices through the stock repurchase program, and to the benefit of the the Individual Defendants, whose proportionate stakes in AOL increased as a result of that program.  By reason

of their positions with AOL, the Individual Defendants were in possession of material non-public information concerning the financial condition, liquidity, future prospects of AOL and the true value of the Patent Portfolio.

25.     The Patent Portfolio covered a wide range of internet-based activities in areas such as email, Web-search rankings, Web browsers, instant messaging and video conferencing. From as early as 2009, defendants recognized the value of AOL's Patent Portfolio. AOL's submissions to the SEC after the sale, however, indicate that the carrying value of the Patent Portfolio on AOL's books, up until the point of sale, was only $4 million (*see*,10-Q for quarter ending June 30, 2012). AOL was well aware that its Patent Portfolio was worth far more than $4 million since the 2009 spin-off from Time Warner, and at the very latest by the summer of 2011.

26.     First, transactions occurred in the marketplace that provided indicia to defendants of the significant value of the Patent Portfolio. On June 30, 2011, Nortel Networks Corp. announced that it had concluded a successful auction of its entire remaining patent portfolio and patent applications. The winning bidder was a consortium consisting of Apple Inc., Microsoft Corp., Research in Motion Ltd., and Sony Corp. A July 1, 2011 article in Bloomberg, entitled "Apple Joins Microsoft, RIM in $4.5 Billion Buy of Nortel Patents," quoted David Descoteaux, managing director of Lazard Ltd., Nortel's investment banker, in part, as follows:

> The price and the bidding show that companies considered the patents vital to their strategic goals, including the need to defend themselves from patent lawsuits and to roll out future products, Descoteaux said.
>
> "This has woken up the world to what IP means and how companies think about ways of monetizing intellectual property," he said.

In addition, Google had recently acquired Motorola Mobility for $12.5 billion, a deal that was driven in substantial part by giving Google access to a trove of more than 17,000 patents (plus 7,500 more that are awaiting approval).

27.     Technology patents were particularly valuable for two reasons.  First, and more traditionally, a patent confers the right to exclude others from use of the patented technology, resulting in a potential exclusive pecuniary gain to the patent-holder (and prevention of such gain to competitors).  Second, due to a dramatic increase in patent infringement litigation among the major technology companies, it became strategically important for IT giants to secure as many foundational IT patents as possible in their given fields, even if the underlying technology had grown somewhat stale.  Citing  the myriad  patent infringement lawsuits filed by tech giants like Apple, Samsung, Kodak and Yahoo, The New York Times described the fervid deal-making for patent portfolios as an "arms race among the industry's giants to protect themselves from competitors' legal strikes—or to collect ammunition of their own,"  .  Michael J. de la Merced, *AOL-Microsoft Deal Shows Patent Frenzy Remains Strong*, N.Y. Times, (Apr. 9, 2011), http://dealbook.nytimes.com/2012/04/09/with-aol-microsoft-deal-frenzy-for-patents-remains-strong/?smid=pl-share.  By building up its own patent trove, a tech giant would deter lawsuits against it for patent infringement through the unspoken threat of a countersuit for infringement of the accused's own intellectual property.   A large patent trove concerning foundational technology thus created a tremendous competitive advantage.

28.     Second, at the time of the Time Warner spinoff of AOL, in 2009, Armstrong and others at AOL had spent significant time negotiating with Time Warner to carve-out the Patent Portfolio so that AOL could preserve it post-spinoff as a valuable cashable asset.  Indeed, on March 13, 2012, toward the end of the Class Period, defendant Armstrong referred to the Patent

Portfolio as "beachfront property" and explained to the audience at a Barclay's investor conference that he considered it one of the "top three" patent portfolios in the marketplace.

29. The successful Nortel and Motorola deals made the time right to close out a deal with Microsoft. Having seen what the Nortel and Motorola deals reaped, and realizing that the Patent Portfolio was peaking as a bankable asset, particularly for its defensive value arising out of the legacy patents, defendants committed themselves to selling it. Given Microsoft's history of litigation (followed by collaboration) with AOL, Microsoft was the logical target for a sale of such a portfolio of legacy patents. In fact, having scrutinized AOL's Patent Portfolio for many years, Microsoft was uniquely positioned to know that the Patent Portfolio was for sale and to know its actual value. As reported by the New York Times, "[s]ome of the patents in AOL's portfolio would be quite familiar to Microsoft, since they came from its former rival in Internet browsing software, Netscape Communications, which AOL bought in 1998 for $4.2 billion." Steve Lohr, *Microsoft's AOL Deal Intensifies Patent Wars*, N.Y. Times (Apr. 9, 2012) http://www.nytimes.com/2012/04/10/technology/microsoft-to-buy-aol-patents-for-more-than-1-billion.html. Indeed, in 2002, AOL had sued Microsoft for antitrust violations relating to Microsoft's domination of the Internet browser software market, to the advantage of Microsoft's Internet Explorer browser and to the detriment of AOL's Netscape browser. The parties settled the case a year later for $750 million and a wide-ranging licensing and collaboration agreement covering internet, digital media and instant messaging technologies.

30. Tech industry expert and Silicon Valley insider, Mark Stephens, who publishes under the pen name "Robert X. Cringely," observed, at the time AOL's sale to Microsoft was announced, that the sale functioned as an extension of AOL's and Microsoft's previous dealings, particularly in light of the fact that the settlement of the antitrust claim did not resolve any latent

patent infringement claims AOL might have had, preserving such claims as valuable assets down the line:

> Remember AOL was one of the companies that successfully sued Microsoft for anti-trust, both in its own name and that of its Netscape acquisition. Microsoft paid AOL $750 million back in 2003. Think of this $1 billion payment as the final installment of Microsoft's settlement with AOL.
>
> The 2003 settlement with AOL didn't cover patent infringement.  Even back then Time Warner lawyers felt that there was another $500 million to be recovered from Microsoft for patent infringement. Yet for some reason they never went back for the money.
>
> So Microsoft has had that potential litigation hanging over its corporate head for almost a decade. Not only was there infringement, but that infringement could be easily documented as *willful* with a decade of litigation leaving a clear paper trail of causation. Microsoft couldn't claim they were unaware of the AOL patents. And since they were aware they could be subject to treble damages. That's a potential $1.5 billion hit to earnings.
>
> Much better to cut the present deal, paying just over $1 billion as an asset purchase.

Mark C. Stephens, *Microsoft AOL Patent Theater*, I, CRINGELY, http://www.cringely.com/ 2012/04/12/microsoft-aol-patent-theater (last visited Sept. 25, 2012).  (Mr. Stephens is a well-known technology journalist and 30-year tech-industry veteran working under the nom d'plume *Robert X. Cringely*. Mr. Stephens' work has appeared in the The New York Times, Newsweek, and Forbes, among other publications.  He is author of the best-selling book "Accidental Empires" and writer of a number of Silicon-Valley-centered documentaries that have aired on PBS).

     31.     Finally, other reports indicate that AOL had been planning its asset sale well in advance of the sales announcement in April 2012.  For example, AOL retained both of its legal advisors months or years earlier.  The well known IP firm Finnegan, Henderson, Farabow, Garrett & Dunner, LLP (the "Finnegan Firm"), has publicly claimed that its work to help AOL monetize the Company's patents started many years ago, presumably around the time of AOL's spin-off from Time Warner.  The Finnegan Firm website made the following acknowledgement in its description of a July 3, 2012 seminar event at which a partner of the firm, Mr. C. Gregory Gramenopoulos, would speak: "When AOL began a program three and a half years ago to monetize patents through strategic patenting, they called on Greg Gramenopoulos.  The work of

Greg's team culminated a few weeks ago when they closed a $1.056 Billion deal with

Microsoft…." Executives' Guide to Patent Strategy: IP Monetization, Licensing, and Due

Diligence,Finnegan, http://www.finnegan.com/ExecutivesGuidetoPatentStrategyIPMonetization

LicensingandDueDiligenceJuly32012/ (last visited Sept. 25, 2012).  AOL's second legal advisor,

Wachtell, Lipton, Rosen & Katz, LLP ("Wachtell"), was retained by no later than August 2011,

according to media reports.

      32.      On August 11, 2011, defendants issued a press release announcing a $250 million

stock repurchase authorization.  AOL's press release stated in part:

> "We believe this stock repurchase makes sense for both our company and our shareholders," said Tim Armstrong, Chairman and CEO. "We are continuing the disciplined execution of our strategy and have confidence in our future growth prospects."
>
> "This announcement highlights both our strong balance sheet and free cash flow generation," said Artie Minson, CFO. "We believe this is a unique opportunity to invest in our company."
>
> Under the program, AOL is authorized to repurchase up to $250 million of its outstanding shares of common stock from time to time over the next 12 months. The timing and amount of any shares repurchased will be determined by the Company's management based on its evaluation of market conditions, the trading price of the stock and other factors. The repurchases may be made on the open market, in block trades or otherwise and may include derivative transactions. The repurchase program may be suspended or discontinued at any time.

The repurchase program was implemented after AOL reported dismal second-quarter results,

with revenue down eight percent compared to a year earlier, and a net loss of $11.8 million.

Shares in the Company fell to their lowest level since AOL's spin off from Time Warner, and

AOL lowered its outlook for the year.  While defendants may have seen a "unique opportunity"

to invest in AOL, it was only because, as described herein, defendants possessed material inside

information that the market lacked, that, once disclosed, would boost AOL's financials and stock price.

33.     Defendants' statements were materially false and misleading as they failed to disclose favorable and material nonpublic information. The true facts, which were known by defendants but concealed from the investing public during the Class Period, were that defendants had already committed to a plan to sell AOL's valuable Patent Portfolio and Microsoft was the likely and inevitable purchaser.

34.     During the fall of 2011, the Company sought and received authorization to sell the Patent Portfolio from AOL's Board of Directors and Microsoft began conducting due diligence on the Patent Portfolio – a portfolio Microsoft admits it had been tracking for years. In fact, at some time during the fall, as defendant Armstrong later acknowledged, Armstrong contacted Microsoft CEO Steve Ballmer to spur Microsoft's long-held interest in acquiring the Patent Portfolio and to close the deal.

35.     On November 2, 2011, during the Company's third quarter 2011 Earnings Call, defendant Minson stated, in part, the following:

> Finally, as you know, our Board of Directors authorized the company to repurchase up to $250 million of common stock on August 10th and since then we have repurchased approximately 9.7 million shares at an average price of $13.39, for $130 million in aggregate, bringing our shares outstanding to approximately 97 million shares. Clearly, we believe in our opportunity, our strategy, and the asset value underlying both.

As to the repurchase program, Defendant Armstrong stated:

> I would just say on the resource use, I think we announced a $250 million buyback. If we feel like the price is right, we will continue to execute that buyback program, I think you can see we were aggressive about it, and we felt the Company has been under-valued, so I think you will continue to see us doing that, based on the valuation of the Company.

This statement was materially incomplete because defendants made only a generic, unspecified statement about the company being undervalued when they knew but did not disclose that a sale of the patent portfolio was coming to fruition.

36.     On November 2, 2011, defendants filed the Company's 10-Q for the third quarter 2011:

> If we are unable to successfully implement our strategic plan and grow the earnings generated by our online advertising services, we may need to reassess our cost structure and/or seek other financing alternatives to fund our business. We may also consider other financing alternatives, as a result of our recent acquisition activities. If it is necessary to seek other financing alternatives, our ability to obtain future financing will depend on, among other things, our financial condition and results of operations as well as the condition of the capital markets or other credit markets at the time we seek financing. Currently we do not have a credit rating from the credit rating agencies, so our access to the capital markets may be limited. As part of our ongoing assessment of our business and availability of capital and to enhance our liquidity position, we have divested of certain assets and product lines and may consider divesting of additional assets or product lines.

37.     In connection with the Company's repurchase program, defendants reported in the third quarter 2011 10-Q, in part, the following:

> As of November 2, 2011, the Company repurchased a total of 9.7 million shares at a weighted average price of $13.39 per share under this program. Shares repurchased under the program are recorded as treasury stock on the Company's consolidated balance sheet. The repurchase program may be suspended or discontinued at any time. The shares repurchased during the three and nine months ended September 30, 2011 were not the result of an accelerated share repurchase agreement and did not result in any derivative transactions. Management has not made a decision on whether shares purchased under this program will be retired or reissued.

38.     Defendants' statements concerning AOL's Third Quarter 2011 results and financial condition were materially false and misleading as they failed to disclose favorable and material nonpublic information. The true facts, which were known by defendants but concealed

from the investing public during the Class Period, were that defendants had already committed to a plan to sell AOL's valuable Patent Portfolio and had selected Microsoft as purchaser; that the Company had sought and received authorization to sell the Patent Portfolio from AOL's Board of Directors and Microsoft had been conducting due diligence on the Patent Portfolio – a portfolio Microsoft admits it had been tracking for years; and that defendant Armstrong had contacted Microsoft CEO Steve Ballmer to close out Microsoft's long-anticipated plan to acquire the Patent Portfolio.   As a result, defendants also violated GAAP by failing to disclose a description of the activities related to the sale of the Patent Portfolio, including the facts and circumstances leading to the expected activity, such as Microsoft's due diligence, and the expected completion date.   Moreover, defendants failed to disclose that AOL was actively pursuing the sale of its Patent Portfolio – one of AOL's intangible assets – for more than $1 billion, which was reasonably likely to result in AOL's liquidity increasing in a material way.

39.     On December 5, 2011, defendant Armstrong participated at the UBS Media and Communications Conference.  During the conference, he stated, in part, the following:

> **Tim Armstrong** - AOL, Inc. – CEO
> So, I feel really good about the business overall this year, and I think as an investor, I'm a big personal investor in the Company. I'm a top 20 shareholder.  We did a lot this year, and hopefully next year we're going to do more. But I think AOL is well positioned in where the future of the Internet is going. And, again, you may not – you can't say we don't have a clear strategy. You may not like the strategy, but we have a clear strategy, and we're going to continue to execute against it.
>
> \*               \*               \*
>
> **Brian Pitz**
> Great.  I'll just ask one more and then turn it over to the audience again. You had announced a fairly substantial buyback, back when the stock took a pretty major hit. I think it was 26% of the outstanding float at the time.  That was a significant change from the way you and Artie had kind of viewed the business previously.

What changed there, and how should we think about your buyback plans going forward?

**Tim Armstrong** - AOL, Inc. – CEO

I think it became a no-brainer. From a standpoint of where we could put our resources and money, there is a time period that says – a lot of our Board of Directors bought stock.  We announced a huge buyback.  We … announced the results of the buyback we had done so far during the Q3 earnings, and I think from that standpoint, we bought back roughly 7% of the Company. So if you take a giant step back from AOL as a whole, I would just point out the following things. One is we started with strategy structure, cost structure. Strategy has been the same. It continues to be the same. And we're going to keep hammering on it. The structure of the Company is getting simpler over time, and it's going to continue to get simpler over time. And on the cost structure side, we basically removed $500 million plus and we are continuing to work on the cost structure side of things overall, and then, separately, I think from an investor standpoint, we have really tried to do what we think is smart with M&A investing, and also buying back shares. So we are setting the Company up that as the results get better, investors that are with us now are going to get rewarded for it. 80% of the shares are held by institutional, mostly long-term investors, and we've shrunk the outstanding shares meaningfully. And I won't comment on what we're doing right now with the buyback, but the Q3 results, I think, were – we showed people how serious we were about it.

40.     Defendant Armstrong's statements were materially false and misleading as they failed to disclose favorable and material nonpublic information.  The true facts, which were known by defendants but concealed from the investing public during the Class Period, were that defendants had already committed to a plan to sell AOL's valuable Patent Portfolio and had selected Microsoft as purchaser; that during the fall of 2011, the Company sought and received authorization to sell the Patent Portfolio from AOL's Board of Directors; that  and Microsoft had already begun conducting due diligence on the Patent Portfolio (a portfolio Microsoft admits it had been tracking for years); and that defendant Armstrong had contacted Microsoft CEO Steve Ballmer to spur the closing out of Microsoft's long-held interest in acquiring the Patent Portfolio.

41.     On December 21, 2011, Starboard Value LP, a 5.2% shareholder of AOL, wrote a letter to defendant Armstrong, stating, in part, the following:

> At the current price, we believe that AOL's market value reflects only the value of the Company's highly profitable Access business and its net cash position.  This implies that investors are ascribing no value to AOL's media assets, including its Advertising Network, Search business, and extensive portfolio of Display properties.  We believe that this valuation discrepancy is primarily due to the Company's massive operating losses in its Display business, as well as continued concern over further acquisitions and investments into money-losing growth initiatives like Patch.

42.     On December 21, 2011, rather than address the issues Starboard raised about AOL's undervalued assets, AOL issued a response to Starboard's letter, stating, in part, the following:

> AOL has a clear strategy and operational plan to provide our consumers and customers with exceptional value, which we believe will lead to the creation of shareholder value. Our Board and management team remain firmly committed to creating value for all shareholders and we will continue to aggressively execute on our strategy in 2012 as we continue the turnaround of AOL.

43.     On January 11, 2012, defendant Minson participated in the Needham Growth Conference.  During the conference, he stated, in part, the following:

> **Artie Minson -** AOL Inc. - CFO and President, AOL Services
> You know, we have obviously done some significant M&A from Huffington Post and goviral. So it's been a busy year on that standpoint, but we are always looking for ways to be more efficient and look at ways to optimize the assets that we have. –
>
> **Laura Martin -** Needham & Co. - Analyst
> So it sounds like asset sales, those are kind of behind us.  We shouldn't expect to see too many more of those?
>
> **Artie Minson -** AOL Inc. - CFO and President, AOL Services
> You know, we are always – look, we always say, you know, right price, we will have a conversation with different people.
>
> **Laura Martin -** Needham & Co. - Analyst
> Don't sell your house.

> **Artie Minson** - AOL Inc. - CFO and President, AOL Services
> But there is nothing on the horizon right now. I would say – I
> would just point out the other thing we did is when the stock took a
> hit back in the summer, we pretty quickly, within 24 hours of the
> initial drop, we put in a pretty meaningful buyback program
> particular and relative to the equity value of the Company at that
> point in time, and we executed over half of that in a quarter. So I
> think we have shown whether it was cost-cutting, taking $500
> million out in the first year or selling $650 million of assets or
> returning capital to shareholders through a buyback, we have
> shown we are willing to make some pretty bold moves on that end.

44.     Defendant Minson's statements during the conference were materially false and
misleading because he failed to disclose favorable and material nonpublic information.  The true
facts, which were known by defendants but concealed from the investing public during the Class
Period, were as follows: that defendants had already committed to selling AOL's valuable Patent
Portfolio and had received authorization to do so from AOL's Board of Directors; defendants
intended to sell its Patent Portfolio to Microsoft, which had been spurred on by AOL and which
had begun its due diligence; and, defendants were aware of the Patent Portfolio's extraordinary
value.

45.     Defendant Minson's affirmative misrepresentation – that there were no asset sales
on the horizon for AOL – lingered for months as defendants moved forward with their plan to
sell what was arguably the Company's most valuable asset.  The misrepresentation to the market
was never corrected even though defendants assumed an obligation to disclose the truth to the
market following Minson's misrepresentation.

46.     On February 1, 2012, during the Company's fourth quarter 2011 Earnings Call,
defendant Minson stated in part, the following:

> We continued to repurchase stock during the quarter at very
> attractive prices. Bought back 3.3 million shares since our last call,
> and over 12% of our shares outstanding since our Board authorized
> repurchase stock in August.   As a reminder, we have
> approximately $72 million left in the original authorization.

47.     On February 24, 2012, defendants filed the Company's 2011 10-K, which stated in part:

> Forecasts of future cash flows are dependent on many factors, including future economic conditions and the execution of our strategy. We expect to fund our ongoing working capital, investing and financing requirements, including future repurchases of common stock, through our existing cash balance and cash flows from operations.

> *                *                *

> Currently we do not have a credit rating from the credit rating agencies, so our access to the capital markets may be limited. As part of our ongoing assessment of our business and availability of capital and to enhance our liquidity position, we have divested of certain assets and product lines and may consider divesting of additional assets or product lines.

48.     In connection with the Company's repurchase program, defendants stated in the 2011 10-K, in part, the following:

> Repurchases have been and will be made in accordance with applicable securities laws in the open market or in private transactions and may include derivative transactions. As of February 1, 2012, we repurchased a total of 13.0 million shares at a weighted average price of $13.62 per share (approximately $178 million) under this program.

49.     Defendants' statements in the 2011 10-K were materially false and misleading as they failed to disclose favorable and material nonpublic information.  The true facts, which were known by defendants but concealed from the investing public during the Class Period, were that defendants had already committed to a plan to sell AOL's valuable Patent Portfolio, the Company had sought and received authorization to sell the Patent Portfolio from AOL's Board of Directors; defendants had selected Microsoft to buy its Patent Portfolio and Microsoft had already embarked on its due diligence process.  Furthermore, defendants violated generally accepted accounting principles ("GAAP") by failing to disclose a description of the activities

related to the sale of the Patent Portfolio, including the facts and circumstances leading to the

expected activity, such as Microsoft's due diligence and the expected completion date.

Moreover, defendants failed to disclose the events – the impending sale of the Patent Portfolio –

that were reasonably likely to result in AOL's liquidity increasing in a material way.

50.     The Patent Portfolio became the subject of wider attention and speculation

(including as to its value) after Starboard sent another letter to AOL's Board, accusing it and the

Company of failing to act properly to monetize AOL's assets.  Starboard's February 24th, 2012,

letter to AOL's Board stated, in part:

> AOL owns a robust portfolio of extremely valuable and foundational intellectual property that has gone unrecognized and underutilized. This portfolio of more than 800 patents broadly covers internet technologies with focus in areas such as secure data transit and e-commerce, travel navigation and turn-by-turn directions, search-related online advertising, real-time shopping, and shopping wish list, among many others.

> Since our initial public involvement in AOL, we have been approached by multiple parties specializing in intellectual property valuation and monetization, some of whom believe that (i) a significant number of large internet-related technology companies may be infringing on these patents, and (ii) AOL's patent portfolio could produce in excess of $1 billion of licensing income if appropriately harvested and monetized. Unfortunately, several of these parties have expressed severe frustration that AOL has been entirely unresponsive to their proposals regarding ways to take advantage of this underutilized asset. The Company's inaction is alarming given our understanding that many of the key patents have looming expiration dates over the next several years which could render them worthless if not immediately utilized.

51.     AOL responded to Starboard's letter with an acknowledgement:  "We have a

valuable patent portfolio and several months ago, prior to Starboard's first letter, the AOL Board

of Directors authorized the start of a process, and hired advisors, to realize the value of these

non-strategic assets."  However, that statement was materially incomplete.  In fact, at the time

AOL received and responded to Starboard's letter, defendant Armstrong had already contacted

Microsoft CEO, Steve Ballmer, to spur the tech giant's purchase of the Patent Portfolio it had diligently tracked for years and on which Microsoft had already begun performing its due diligence.

52.   Moreover, Starboard's estimate that the Patent Portfolio could generate in excess of $1 billion was not a substitute for the company's own acknowledgement of the value of its portfolio. Indeed, experts in the field speculated, between February 24th and the sale on April 5th, 2012, that the Patent Portfolio was worth as little as $290 million. The uncertainty meant that the market did not have sufficient information to adequately discern the value of AOL's Patent Portfolio until AOL finally informed the public of its private billion-dollar sale on April 9, 2012.

53.   The attention from Starboard forced AOL's hand and AOL rushed into an "auction" process to legitimize its ongoing dealings with Microsoft. AOL's February 24th acknowledgement revealed that while defendants were actively engaged in a plan to monetize the Patent Portfolio, they had been omitting from their public statements any information about their plan and the actual value of the Patent Portfolio. In fact, during the time that defendant Armstrong acknowledged the Company was in the process of "realizing" the value of its Patent Portfolio, defendant Minson affirmatively misrepresented that fact to the market, on January 22, 2011. Notably, however, AOL still failed to reveal to the market that AOL planned to license or sell its *entire* patent portfolio, that it would do so within a matter of weeks, and that the price tag would amount to more than a billion dollars.

54.   On March 13, 2012, defendant Armstrong participated in Barclays Internet Connect Conference. During the conference, Armstrong stated, in part, the following:

**Anthony DiClemente** - Barclays
Okay. There's been some recent discussion out there about AOL's patent portfolio. I wonder if you could talk a little bit about your – give us your view on the value of your patent portfolio and how do you think you might realize that value or monetize that value?

**Tim Armstrong** - AOL Inc. - Chairman & CEO
Yes. So the patent portfolio is something we started looking at last probably September and we had kicked off a process last September because of the interest in IP and patents and we had a lot of incoming interest in AOL's patent portfolio.

So to basically summarize AOL's patent portfolio, it's beachfront property in East Hampton. I don't know why I'm going to the Hampton's, but – it's basically extremely valuable. It is unique in the fact that it has some of the foundation patents for the Internet inside of it.  There's roughly 160 or so patent portfolios in the marketplace right now.  I would consider our patent portfolio to be probably top three if we were to take it out to the marketplace.

And when you think about patents, patents basically drop into a few different buckets. One is there's basically a set of standard patents that people have been licensing and getting revenue off of, so that's the Kodak situation where most of their patents basically were – had been licensed out already and there were 30 or 40 major companies that had licensed their patent portfolio.

So one is that's a great revenue stream, but if you want to transact on that patent portfolio it has less of a value in terms of selling it. And then you look at something more like Nortel, which had probably less licensees of it and more unique kind of what they call foundational patents and it.

So AOL's – we specifically – when we were spinning out of Time Warner this was a huge negotiation and I spent a lot of personal time on it and some of our folks did because we knew at some point in the future the IP was going to be valuable so we negotiated for a few months on the way out of Time Warner and got our patent portfolio set up.

And when you think about basically the opportunity to use the patent portfolio or some of our IP around it, it basically comes down to the following things.  One is we have to protect our Company on a go-forward basis from an operating standpoint.

> Two is you have to measure your portfolio against what's in the
> marketplace today and what is foundational versus non-
> foundational in terms of the patents. And we have a very
> foundational patent portfolio. We have – about half of our patent
> portfolio – what?

55.     At no time during the conference, did defendant Armstrong disclose the complete

facts, which were known by defendants but concealed from the investing public during the Class

Period: Armstrong disclosed that AOL had been investigating the sale of its Patent Portfolio, but

did not reveal that defendants had already selected Microsoft to buy AOL's Patent Portfolio nor

that defendant Armstrong had called Microsoft CEO Steve Ballmer to spur Microsoft's long-held

interest in the Patent Portfolio nor that Microsoft had been tracking AOL's Patent Portfolio for

years and started conducting due diligence several months in advance of the announced sale.

56.     On March 22, 2012, AOL reportedly opened an "auction" process that lasted until

April 5th, the date that AOL and Microsoft reached agreement – two-and-a-half weeks. AOL

purportedly received bids from Facebook, Goldman Sachs and Microsoft, among others.

Ultimately, AOL selected Microsoft's bid of more than $1 billion. AOL's legal advisors were

the Finnegan Law Firm and Wachtell. AOL's financial advisors were Evercore Partners and

Goldman Sachs Group, Inc.

57.     AOL has claimed that its auction was robust and competitive. That this was a

full-fledged open auction strains credulity, however. As Mark Stephens, the tech expert and

Silicon Valley insider, pointed out: "[n]ormally, the sale of hundreds of patents would have

required months of due diligence from bidders, not two weeks," which is the reported time-frame

of the putative auction for AOL's Patent Portfolio. As defendants acknowledged, the sale

process did in fact take many months of due diligence on the part of the winning bidder, and

there is a clear inference that AOL was committed to selling its Patent Portfolio to Microsoft

long before the putative auction. The very secrecy of the alleged auction is at odds with the

price-competition that an auction is designed to foster; where the very fact of the auction is a secret from potential bidders in the market, the process is sub-competitive at best.

58.     The other bidders in the putative auction were not identified by either party to the sale, however reports indicate that they included Goldman Sachs and Facebook, along with e-commerce companies Amazon, eBay and Google.  On information and belief, Goldman Sachs was not a serious bidder, but a strategic partner of Microsoft, acting to portray a private transaction as a public auction.  Goldman Sachs – not usually in the business of acquiring patents – is Microsoft's longtime investment banker and, of course, AOL's financial advisor on this very sale.  Facebook is reported to have bid on the Patent Portfolio and to have approached Microsoft about joining forces to make a joint bid, however AOL rejected that idea since it intended to sell only to Microsoft.  At that point, Facebook, recognizing the reality that Microsoft was the designated buyer, began its own negotiations with Microsoft—the inevitable buyer—to purchase a portion of the Patent Portfolio once it was secured by Microsoft.  Indeed, less than three weeks later, Facebook bought and/or licensed roughly 650 of Microsoft's newly acquired patents.  It is a reasonable inference that Facebook and Microsoft began negotiating their elaborate cross-licensing package well before Microsoft officially acquired the Patent Portfolio.  In terms of the time required for due diligence, it appears unlikely that Microsoft and Facebook could have learned that the Patent Portfolio was for sale, performed their due diligence and submit bids, planned a joint bid (which failed), and scripted a successful bid (for Microsoft), plus agreed to a cross-licensing agreement to bring Facebook back into the circle, in only two-and-a-half weeks.

59.     The apparent purpose of holding an essentially private-transaction out as a public auction was to avoid shareholder lawsuits claiming the sale price was too low.  This was particularly imperative since Starboard began questioning AOL's management and direction in

connection with its failure – up until that point – to recognize and act on its valuable Patent Portfolio.

60.     Despite defendants' knowledge of the significant value of the Patent Portfolio and their intent to sell it, defendants failed to disclose this relevant information in the Company's public filings with the SEC during the Class Period.   Defendants' misrepresentations and omissions of an existing reality – systematically and materially depressing the Company's stock price – resulted in shareholders selling, and the Company buying, AOL stock at artificially low prices.  As noted by AOL's General Counsel Julie Jacobs, "[t]he outsiders that were valuing these [did] not understand patents and didn't understand what we had."

**The True Value of the Patent Portfolio is Revealed**

61.     On April 9, 2012, the Company issued a press release announcing the $1.056 billion sale of the Patent Portfolio.  The release stated, in relevant part, the following:

(a)     "[T]hat the Company has entered into a definitive agreement to sell over 800 of its patents and their related patent applications to Microsoft Corporation (NASDAQ: MSFT) ("Microsoft") and to grant Microsoft a non-exclusive license to its retained patent portfolio for aggregate proceeds of $1.056 billion in cash."

(b)     The press release quoted Brad Smith, General Counsel and Executive Vice President, Legal and Corporate Affairs, at Microsoft, in part, as follows "[t]his is a valuable portfolio that we have been following for years and analyzing in detail for several months."

(c)     The announcement detailed select terms of the sale (the tax burden would be minimal, and the parties agreed to a 20% termination fee) and indicated that the Company intended "to return a significant portion of the sale proceeds to shareholders."

26

62.     On the news of the sale, AOL's stock price skyrocketed over 43% in a single trading day, closing at $26.40, from the prior day's close of $18.42 per share, on very high trading volume of almost 26 million shares.

**Violations of GAAP and SEC Regulations**

63.     As set forth below, defendants published financial statements and information that violated GAAP and SEC Regulations prohibiting false and misleading public disclosures.

64.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices.  The SEC has the statutory authority to promulgate GAAP for public companies, and has delegated that authority to the Financial Standards Accounting Board ("FASB").  The SEC requires public companies to prepare their financial statements in accordance with GAAP. As set forth in SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)), financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

65.     GAAP requires that a "description of the exit or disposal activity, including the facts and circumstances leading to the expected activity and the expected completion date" shall be disclosed in notes to financial statements that include the period in which disposal activity is initiated and any subsequent period until the activity is completed.  ASC 420-10-50-1.  GAAP also requires companies to disclose "[a] description of the facts and circumstances leading to the expected disposal, the expected manner and timing of that disposal, and, if not separately presented on the face of the statement, the carrying amount(s) of the major classes of assets and liabilities included as part of a disposal group."  ASC 205-20-50-1.

66.     As discussed above, during the fall of 2011, the Company sought and received authorization to sell the Patent Portfolio from AOL's Board of Directors.  Defendants, however,

failed to disclose the facts and circumstances leading to the expected disposal of the Patent Portfolio, and the expected manner and timing of that disposal, in contravention of GAAP.

67.     Under SEC Rules, defendants were required by Item 7 of Form 10-K and Item 2 of Form 10-Q, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") to furnish information required by Item 303 of Regulation S-K [17 C.F.R. 229.303]. In discussing results of operations, Item 303 of Regulation S-K requires the registrant to:

> *Liquidity.* Identify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way. If a material deficiency is identified, indicate the course of action that the registrant has taken or proposes to take to remedy the deficiency. Also identify and separately describe internal and external sources of liquidity, and briefly discuss any material unused sources of liquid assets.

68.     The Instructions to Paragraph 303(a) further states that "[l]iquidity generally shall be discussed on both a long-term and short-term basis."

69.     In addition, the SEC, in its May 18, 1989 Interpretive Release No. 34-26831, indicated that registrants should employ the following two-step analysis in determining when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303 of Regulation S-K:

> A disclosure duty exists where a trend, demand, commitment, *event* or uncertainty is both presently known to management and *is reasonably likely to have a material effect on the registrant's financial condition or results of operations.*

Emphasis added.

70.     Despite defendants' plan to monetize the Patent Portfolio in the near future, which was likely to result in a very substantial increase in the Company's liquidity, defendants failed to disclose, as required by SEC rules, either the Patent Portfolio as a material unused source of

liquid assets or that the Company had committed to a plan to sell and significantly add to its liquidity from the sale of the Patent Portfolio.

**The Undisclosed Information was Material to Investors**

71.    The undisclosed information was material to investors.    According to the AICPA's, AT Section 701 Management's Discussion and Analysis:

> In the context of an MD&A presentation, the concept of materiality encompasses both material omissions (for example, the omission of trends, events, and uncertainties that are currently known to management that are reasonably likely to have material effects on the entity's financial condition, results of operations, liquidity, or capital resources) and material misstatements in MD&A, both of which are referred to herein as a misstatement. Assessing the significance of a misstatement of some items in MD&A may be more dependent upon qualitative than quantitative considerations. Qualitative aspects of materiality relate to the relevance and reliability of the information presented (for example, qualitative aspects of materiality are considered in assessing whether the underlying information, determinations, estimates, and assumptions of the entity provide a reasonable basis for the disclosures in the MD&A).

72.    As discussed herein, the disclosures contained material omissions of trends, events, and uncertainties related to defendants intent to monetize AOL's valuable Patent Portfolio. Indeed, when defendants finally revealed the sale of the Patent Portfolio, investors reacted, immediately adjusting the market price of AOL stock upward to $26.35.

73.    Defendants failed to disclose information that was material to shareholders and that defendants were obligated to disclose to the market. For example, defendant Minson's misrepresentation to the market in January 2012 that no asset sales were on AOL's horizon was false at the time it was made because defendants had already committed to a plan to sell AOL's valuable Patent Portfolio, the Company had sought and received authorization to sell the Patent Portfolio from AOL's Board of Directors, and defendants selected Microsoft to buy its Patent Portfolio well before the official auction process had even begun. Indeed, defendant Armstrong

contacted Microsoft CEO Steve Ballmer to Microsoft to effect completion of the deal, and Microsoft's General Counsel admitted after the sale that Microsoft had been tracking AOL's Patent Portfolio for years and conducting due diligence for months.  Yet defendants failed to issue any correction to defendant Minson's apparent misrepresentation of the facts.

74.    The market, including the putative class, relied on defendants' representations and incurred damages as a result.

**Causation and Economic Loss**

75.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and specifically developed a course of conduct to maintain an artificially low stock price for AOL common stock.  Defendants' course of conduct operated as deceit on sellers of AOL's common stock during the Class Period by misrepresenting the Company's liquidity and future prospects.  Over a period of approximately eight months, defendants improperly depressed the Company's stock price, allowing AOL to purchase more than $178 million of the Company shares at artificially low prices.  When defendants' prior misrepresentations and deceptive conduct were revealed to investors, shares of AOL stock increased precipitously, eliminating the prior artificial deflation in the price of AOL's shares.  As a result, Plaintiff and other members of the Class suffered economic losses, i.e. damages under the federal securities laws, when they sold their shares at a deflated price.

76.    By improperly characterizing the Company's liquidity and future prospects, defendants presented a misleading image from which to value AOL common stock.  During the Class Period, defendants failed to disclose that defendants had already committed to a plan to sell AOL's valuable Patent Portfolio, the Company had sought and received authorization to sell the Patent Portfolio from AOL's Board of Directors; AOL had selected Microsoft to buy its Patent Portfolio well before the official auction process had even begun – indeed, defendant Armstrong

contacted Microsoft CEO Steve Ballmer to close out the long-lingering expectation that Microsoft would acquire the Patent Portfolio; and Microsoft's General Counsel admits that Microsoft had been tracking AOL's Patent Portfolio for years and started conducting due diligence several months in advance of the sale.  Defendants' omissions and misstatements caused the market to assign an artificially low price to AOL's stock, and permitted AOL to purchase its common stock at artificially low prices throughout the Class Period and until the truth was ultimately revealed to investors.

77.    Defendants' false and materially misleading statements had the intended effect of causing AOL's shares to trade at artificial levels throughout the Class Period reaching a Class Period low of $11.25 per share on September 22, 2011.  As a result, the Company was able to purchase AOL stock at artificially low prices.

78.    On April 9, 2012, however, when investors learned that AOL's Patent Portfolio was in fact worth in excess of $1 billion, and that it was being sold, the market price of AOL common stock skyrocketed by 43%.  Prior to the April 9th announcement, confusion reigned on the subject of the Patent Portfolio's potential value.  Within two weeks of the sale, patent advisory firm M-Cam estimated the Patent Portfolio to be worth no more than $290 million.  In fact, M-Cam's president stated on March 29, 2012, that the Patent Portfolio is "worth much less than what investors have estimated, based largely on the fact that most of AOL's patents are not commercially viable, or junk grade." In contrast, Starboard's February 24, 2012 letter claimed that the Patent Portfolio could be worth "in excess of $1 billion… if appropriately harvested and monetized."  Other reports had the Patent Portfolio valued between $300 million and $650 million.  It was only when the sale was finally announced that the market was able to ascertain the value of the Patent Portfolio.

79.     These belated revelations also evidenced defendants' prior falsification of AOL's true value.  As investors and the market ultimately learned, defendants had understated AOL's liquidity and future prospects.

80.     As a direct result of investors learning the truth about the Company on April 9, 2012, AOL's stock price skyrocketed over 43%, increasing $7.98 per share, from the prior day's close of $18.42 per share – in the single trading day, on very high trading volume of almost 26 million shares traded – as compared to the S&P 500, which lost $15.25, closing at $1,382.20 on that day.  The previous day's trading volume of AOL was 861,100 shares.  This dramatic share price increase eradicated the artificial deflation from AOL's share price, causing real economic loss to Class members who sold AOL securities during the Class Period.

81.     The increase in the price of AOL's securities at the end of the Class Period was a direct result of the nature and extent of defendants' concealment being revealed to investors and the market.  The timing and magnitude of AOL's stock price increase on April 9, 2012 as a result of the announcement of the sale – as compared to the rest of the financial marketplace - negates any inference that the losses suffered by plaintiff and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to defendants' fraudulent conduct.

82.     The economic loss, i.e. damages suffered by plaintiff and other members of the Class, was a direct result of defendants' fraudulent scheme to artificially depress the price of AOL's stock.

83.     The Individual Defendants were uniquely motivated to artificially depress the price of AOL stock because they stood to gain the most—far more than any other insider—from the downward manipulation of the market.  By withholding material information from the

market, the defendants enabled the company to buy up almost 14% of AOL's common stock from the market at a substantial discount.  With each share removed from the market and returned to AOL's treasury, the shares still-outstanding grew more valuable.  As a result, Minson and Armstrong, the largest of the insider shareholders, experienced a substantially larger pecuniary benefit from the repurchase program than the other insiders, who held lesser quantities of the Company's common stock.

**Additional Scienter Allegations**

84.    As alleged herein, defendants acted with scienter in that each defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding AOL, their control over, and/or receipt and/or modification of AOL's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning AOL, participated in the fraudulent scheme alleged herein.

85.    Defendants were motivated to materially misrepresent to investors the true financial condition of the Company because: (i) it deceived the investing public regarding AOL's liquidity and future prospects; (ii) it enabled defendants to artificially depress the price of AOL shares in aide of the Company's repurchase program; (iii) it enabled AOL to buy approximately 14.8 million shares of its common stock while in possession of material positive non-public information about the Company, which proportionally increased the Individual Defendants'

holdings of AOL common stock; and (iv) it caused plaintiff and other members of the Class to sell AOL common stock at artificially depressed prices.

**Applicability of Presumption of Reliance: Fraud-On-the-Market Doctrine**

86.    At all relevant times, the market for AOL's securities was an efficient market for the following reasons, among others:

(a)    AOL's stock met the requirements for listing, and was listed and actively traded on the NYSE national market exchange, a highly efficient and automated market;

(b)    As a regulated issuer, AOL filed periodic public reports with the SEC;

(c)    AOL regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    AOL was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

87.    As a result of the foregoing, the market for AOL securities promptly digested current information regarding AOL from all publicly available sources and reflected such information in AOL's stock price.  Under these circumstances, all sellers of AOL's common stock during the Class Period suffered similar injury through their sale of AOL common stock at artificially depressed prices and a presumption of reliance applies.

**No Safe Harbor**

88.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of AOL who knew that those statements were false when made.

**Basis of Allegations**

89.     Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of SEC filings by AOL, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**FIRST CLAIM**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

90.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

35

91.     During the Class Period, the Company and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding AOL's liquidity and future prospects; (ii) enable defendants to artificially depressed the price of AOL common stock; (iii) enable AOL to purchase approximately $200 million of AOL common stock at depressed prices while in possession of material positive non-public information about the Company; and (iv) cause plaintiff and other members of the Class to sell AOL common stock at artificially low prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

92.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the sellers of the Company's common stock in an effort to maintain artificially low market prices for AOL's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

93.     Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.  Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal positive material information about the financial condition, liquidity, and future prospects of AOL as specified herein.

94.     Defendants employed devices, schemes and artifices to defraud, while in possession of material, positive non-public information, and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to deceive investors about AOL's true value, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about AOL and its financial condition, liquidity and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the sellers of AOL common stock during the Class Period.

95.     Defendants' primary liability, and controlling person liability, arises from the following facts: (i) Armstrong and Minson were high-level executives of the Company during the Class Period and members of the Company's management team; (ii) Armstrong and Minson, by virtue of their responsibilities and activities as a senior officers of the Company were privy to and participated in the creation, development and reporting of the Company's plans, projections and/or reports; (iii) Armstrong and Minson were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading; and (iv) as alleged above, directly made material misstatements.

96.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts.  These material misrepresentations and/or omissions were done knowingly or with reckless disregard for the purpose and effect of concealing AOL's financial condition and future business prospects from the investing public and supporting the artificially depressed price of its common stock.  As demonstrated by defendants' omissions and misstatements of the Company's business, liquidity, and future prospects of AOL throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and

omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

97.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of AOL common stock was artificially depressed during the Class Period.  In ignorance of the fact that market prices of AOL's publicly-traded common stock was artificially depressed, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which AOL stock traded, and/or on the absence of material positive information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class sold AOL common stock during the Class Period at artificially low prices and were damaged thereby.  At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known the truth regarding the value of the Patent Portfolio and defendants' intent to sell it, which were not disclosed by defendants, plaintiff and other members of the Class would have realized greater value from the sale of their AOL common stock.

98.     By virtue of the foregoing, defendants AOL, Armstrong and Minson have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

99.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective sales of the Company's common stock during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against Individual
### Defendants Armstrong and Minson

100.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101.   The Individual Defendants acted as controlling persons of AOL within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

102.   In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

103.   By virtue of their positions as controlling persons of AOL, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate

39

result of their wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their sales of the Company's common stock during the Class Period.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiff as lead plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as lead counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.    Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  January 18, 2013

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By:    _____
Daniel W. Krasner
Peter C. Harrar
Beth A. Landes
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax:  (212) 545-4653

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2013, I caused the foregoing Amended Securities Class Action Complaint to be served upon the parties below, by securely depositing a true and correct copy thereof in a postpaid wrapper in a depository regularly maintained and exclusively controlled by the United States Government in the Borough of Manhattan, City, County and State of New York:

Jonathan M. Moses
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY  10019

*Attorneys for Defendants*

*Beth Landes*
_____
Beth A. Landes

\708058