UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------X

IN RE AOL, INC. REPURCHASE OFFER LITIGATION : 12 Civ. 3497 (DLC)

: OPINION & ORDER

---------------------------------------X

APPEARANCES

For Lead Plaintiff Barbara Keeling:

Daniel W. Krasner
Peter C. Harrar
Beth A. Landes
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Ave.
New York, NY 10016

For Defendants AOL, Inc., Tim Armstrong, and Arthur T. Minson:

Jonathan M. Moses
Adam M. Gogolak
Michael J. McDuffie
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019

DENISE COTE, District Judge:

This case concerns the sale on April 9, 2012, by defendant AOL, Inc. ("AOL") of a portfolio of patents to Microsoft Corporation for $1.056 billion in cash. At its heart, the Amended Complaint alleges that AOL, along with defendants Tim Armstrong, AOL's CEO, and Arthur T. Minson, its CFO, knew the details of the sale long before it was publicly announced, allowing the company to carry out a stock repurchase program under which it bought approximately 14.8 million shares of its

own stock. When the billion dollar sale was announced, AOL's stock went up 43% in a single day. The plaintiff alleges that she and others who sold AOL stock during a class period running from August 11, 2011 to April 9, 2012, suffered a significant loss in that they sold at a price that was artificially deflated by defendants' failure to disclose information about the patent sale and misleading statements that implied that no such sale was imminent.

Before the Court is defendants' motion to dismiss. For the reasons stated below, the motion to dismiss is granted.

## BACKGROUND

The following facts are as alleged in plaintiff's Second Amended Securities Class Action Complaint (the "Complaint"). AOL, a pioneering internet services provider, was founded in 1985, became a publicly traded company in 1992, and merged with Time Warner in 2001. In 2009, Time Warner spun off AOL, which again became an independent publicly traded company. During the spinoff, Armstrong and others at AOL negotiated with Time Warner to allow AOL to retain a valuable portfolio of patents covering a wide range of internet-based activities, many of them dating back to AOL's early years as an internet pioneer. After the spinoff, AOL carried this portfolio of patents on its books at $4 million.

In 2011, the market for internet technology patents like AOL's began heating up. On June 30, 2011, after conducting an auction, Nortel sold its patent portfolio to a consortium of other technology companies for $4.5 billion. An article in Bloomberg noted the broader implications, observing that the deal had "woken up the world to what IP means and how companies think about ways of monetizing intellectual property." Around the same time, Google acquired Motorola Mobility for $12.5 billion, a purchase that the Complaint says was driven in substantial part by Google's desire to access Motorola's "trove" of patents. This trend of high valuations of technology patents was well-known and widely reported. The Complaint quotes an April 9, 2012 New York Times article that later referred to the period's "patent frenzy" as an "arms race among the industry's giants."

Meanwhile, in the summer of 2011, AOL saw its stock price slump after announcing "dismal" second-quarter earnings. Believing AOL was undervalued, on August 11, 2011, management and the board announced a stock repurchase program, under which AOL was authorized to purchase up to $250 million worth of its own stock. The Complaint alleges that by the time the stock repurchase program was announced, defendants "had already committed to a plan to sell AOL's valuable Patent Portfolio" and that "Microsoft was the . . . inevitable purchaser."

In the fall of 2011, AOL's board authorized the sale of the patents, and Armstrong contacted Steve Ballmer, the CEO of Microsoft, "to spur Microsoft's long-held interest in acquiring the Patent Portfolio and to close the deal." In various public statements made during the fall, however, including a third quarter earnings call and various SEC filings, AOL did not disclose any impending patent sale, mentioning only in its 10-Qs that it would "consider divesting of additional assets or product lines." Meanwhile, the company continued to tout its repurchase program, arguing publicly that its stock was undervalued.

AOL attracted the attention of an activist investor, Starboard Value LP ("Starboard"), which owned 5.2% of the outstanding stock. In December 2011, Starboard began sending letters to AOL's board indicating that the company's stock was underpriced and making suggestions about steps that could be taken to increase its value. On February 24, 2012, Starboard sent a letter to AOL's board highlighting the value of the company's "foundational" patent portfolio and suggesting that steps be taken to monetize it. Starboard speculated that the portfolio could fetch "in excess of $1 billion of licensing income if appropriately harvested and monetized." This letter, the Complaint says, caused "wider attention and speculation" about the patent portfolio, "including as to its value."

AOL responded to Starboard's letter the same day, agreeing that it had a valuable patent portfolio and pointing out that "several months ago, prior to Starboard's first letter, the AOL Board of Directors authorized the start of a process, and hired advisors, to realize the value of these non-strategic assets." The market did not react to this news. In fact, AOL's stock price fell on Friday February 24, and fell further the following Monday. Experts in the field spent the next month actively debating the value of the patent portfolio, with some estimating that it was worth not more than $290 million, and others, like Starboard, placing its value at roughly $1 billion. Armstrong, for his part, publicly praised AOL's patents at a conference on March 13, calling them "extremely valuable" "beachfront property in East Hampton" and classing the portfolio as among the "top three" in the marketplace.

On March 22, AOL opened an auction for the sale of the patent portfolio, which lasted until April 5 and reportedly included bids from Facebook, Goldman Sachs, Amazon, eBay, and Google. On April 9, AOL announced the results of the auction: the patents had been sold to Microsoft for $1.056 billion in cash. The announcement had an immediate effect on the company's valuation, with the stock rising 43% in a single day.

The Amended Complaint alleges that the auction process was a sham, and that the terms of the sale to Microsoft were known

to company insiders long before the auction took place. According to the Complaint, defendants kept the deal secret so that they could buy stock under the repurchase program at a discounted price. The 43% rise in the stock's value after the sale was announced, the Complaint alleges, reflects the true value of the stock, and the degree to which the plaintiff and others like her were harmed by the defendants' misrepresentations.

The key source for this secret deal theory is Mark Stephens, who writes a blog called "I, Cringely" under the pseudonym Robert X. Cringely. Mr. Stephens speculated in a blog post on April 12, 2012, that the auction was a ruse designed to conceal the fact that Microsoft and AOL had long ago agreed to the terms of the sale, which itself was merely the latest chapter in the resolution of an anti-trust suit in 2003. According to Stephens, the 2003 settlement did not resolve AOL's patent infringement claims against Microsoft, and the deal to acquire the patent portfolio was motivated by Microsoft's desire to avoid a suit by AOL for infringement of those same patents. While the Complaint points out that Stephens is a "well-known technology journalist," it does not indicate that Stephens has ever worked at AOL or Microsoft, and the blog post itself does not cite any source at all for its version of events, even a confidential one.

Plaintiff Rosenfarb filed her complaint on May 3, 2012, alleging that defendants AOL, Armstrong, and Minson had committed fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and that defendants Armstrong and Minson were liable as control persons under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). After motion practice, the Court appointed Barbara Keeling lead plaintiff on August 10, 2012. Lead plaintiff Keeling filed an amended complaint on September 28, and on October 26, defendants AOL, Armstrong, and Minson filed a motion to dismiss. That motion became fully submitted on December 14, and on January 8, 2013, the Court granted Keeling's request for leave to file a second amended complaint and denied the motion to dismiss as moot. Keeling filed the second amended complaint on January 18, and on February 1, defendants filed a renewed motion to dismiss.

DISCUSSION

In considering a motion to dismiss, a court must accept as true all allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. Rothstein v. UBS AG, 708 F.3d 82, 94 (2d Cir. 2013). In the context of a securities class action, a court may consider not only the complaint

itself, but also "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ASTI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

To survive a motion to dismiss, the plaintiff must provide the grounds on which her claim rests "through factual allegations sufficient 'to raise a right to relief above the speculative level.'" Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In other words, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).

Securities fraud claims are also subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Rule 9(b) requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the

speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ASTI, 493 F.3d at 99. "Allegations that are conclusory or unsupported by factual assertions are insufficient." Id.

Under the PSLRA, securities fraud plaintiffs alleging an untrue statement of material fact or an omission of a material fact necessary to make statements not misleading must

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1). A plaintiff must therefore "do more than say that the statements . . . were false and misleading; [she] must demonstrate with specificity why and how that is so." Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004).

Plaintiff alleges that defendants violated § 10(b) of the Exchange Act. The SEC rule implementing that section makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b); see also 15 U.S.C. § 78j(b). To succeed on a claim brought under § 10b, a plaintiff must therefore show (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or

sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. Kleinman v. Elan Corp., plc, 706 F.3d 145, 152 (2d Cir. 2013) (citing Dura Pharmaceuticals v. Broudo, 544 U.S. 336, 341-42 (2005)).

Defendants argue that plaintiff has failed to adequately plead a material misstatement or omission, scienter, and loss causation. The motion to dismiss is granted as to the first ground identified by the defendants. As a result, it is unnecessary to reach their arguments regarding scienter and loss causation.

I. Material misstatement or omission

A statement or omission is material if “there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available.” Starr v. Georgeson S’holder, Inc., 412 F.3d 103, 110 (2d Cir. 2005) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)). To support an allegation that statements or omissions are materially misleading, plaintiffs “must demonstrate with specificity why and how that is so.” Rombach, 355 F.3d at 174. If an allegation regarding a statement or omission “is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.” 15 U.S.C. § 78u-4(b)(1).

The Complaint identifies numerous public disclosures by AOL, Armstrong, and Minson during the class period as materially misleading, either because they failed to mention an impending sale of the patent portfolio or because they misleadingly created the impression that no such sale was imminent. The fact that the patent portfolio would soon be sold was material, the plaintiff argues, because of the sale's effect on the company's liquidity. In particular, the plaintiff relies on several pieces of information that she argues were known to company insiders and should have been disclosed: (1) that defendants "had already committed to a plan to sell AOL's valuable Patent Portfolio and had selected Microsoft as purchaser;" (2) that AOL's board had given authorization to sell the patent portfolio; (3) that Microsoft had been conducting "due diligence" on the Patent Portfolio; (4) that Armstrong had contacted Microsoft CEO Steve Ballmer "to close out Microsoft's long-anticipated plan to acquire the Patent Portfolio;" and (5) that AOL "was actively pursuing the sale of its Patent Portfolio . . . for more than $1 billion."

The Complaint fails to adequately plead a material misstatement or omission. First, much of the information plaintiff argues should have been disclosed was in fact made public during the class period, before AOL's stock skyrocketed at the announcement of the actual sale. It was well known that

AOL had retained a valuable patent portfolio after being spun off from Time Warner, and that the market for such patents was heating up in the spring and summer of 2011, making them increasingly valuable. The Nortel and Motorola Mobility transactions, both cited in the Complaint, indicated that groups of tech patents could sell for well in excess of $1 billion.

That AOL's Patent Portfolio in particular might be extremely valuable was also known to the market. AOL specifically disclosed in numerous public filings before and during the class period that its patents were "among [its] most valuable assets," and Armstrong referred to AOL's Patent portfolio, several weeks before it was sold, as "extremely valuable" "beachfront property in East Hampton" that was among the "top three" in the marketplace. The activist investor Starboard publicly speculated that the Patent Portfolio might be worth as much as $1 billion, while some others placed its value lower, at roughly $290 million. Thus, information disclosed to the public by AOL and other information prominently discussed in the press both before and during the class period render implausible any suggestion that the public was not aware that AOL possessed an extremely valuable patent portfolio. It is also obvious that the reasonable investor would not have interpreted the $4 million value at which AOL carried the

patents on its books as an official estimate of the price they would fetch if sold.[1]

The market was also well aware during the class period that AOL was actively working to sell its Patent Portfolio. In February 2012, after Starboard sent its letter criticizing AOL for not monetizing its patent portfolio, the company disclosed that its board had already "authorized the start of a process, and hired advisors, to realize the value of these non-strategic assets." In March, Armstrong explained that the company had "kicked off a process . . . because of the interest in IP and patents and [because] we had a lot of incoming interest in AOL's patent portfolio." None of these disclosures provoked a reaction from the market; it was not until AOL disclosed that Microsoft would buy the patents for $1 billion that the stock price spiked.

In light of the significant mix of information available to the public about the value of AOL's patents and the possibility that they might be sold, the Complaint boils down to an allegation that the auction was a sham and that the information defendants possessed and withheld from the market was not mere preliminary negotiations about a possible transaction, but rather a final deal with set terms, including a known buyer and

---

[1] Indeed, AOL explained in its 10-K filings that, for accounting purposes, it "does not recognize the fair value of internally generated intangible assets."

sale price, established long before the April 9 announcement that had such a dramatic effect on AOL's stock. Plaintiff has not, however, pleaded facts sufficient to raise this theory above the speculative level.

Under the PSLRA, a complaint that is based on information and belief cannot survive a motion to dismiss unless it states with particularity facts that are sufficient to support the belief in question. Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000). The facts in the Complaint are simply not sufficient to support the belief that AOL and Microsoft reached a secret deal for the patent portfolio and jointly orchestrated a sham auction to cover up the $1 billion transaction so that AOL could repurchase a portion of its own stock.

First, the Cringely blog post is not itself sufficient to support the belief that there existed a secret deal between AOL and Microsoft. In the context of a confidential source, the Second Circuit has explained that a complaint must describe such a source "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Novak, 216 F.3d at 314. While Stephens is of course not a confidential source, the Complaint nevertheless fails to provide any basis on which it could be inferred that he would possess access to information about a secret deal between AOL and Microsoft. Indeed, neither

the Complaint nor the blog post alleges that Stephens had either first or second hand knowledge of the matters in question.

Plaintiff argues that the Complaint does not rely on Mr. Stephens as a confidential insider source, but rather uses his blog merely to "provide context and insight" and "amplify" background information. Mr. Stephens's post, plaintiff explains, was not based on inside information, but rather was an inference drawn from public information, such as Microsoft's familiarity with some of the patents in the portfolio[2] and the previous litigation between Microsoft and AOL.

Setting aside the blog post as a factual source, the remaining allegations in the Complaint simply provide no basis for an assertion that AOL and Microsoft reached a secret deal for the sale of the patents months before the auction was conducted. First, the Complaint points out that in the press release announcing the sale, Microsoft's General Counsel acknowledged that his company had been "following" the patent portfolio for years and "analyzing [it] in detail for several months." Second, the Complaint alleges that in the fall of 2011, Armstrong called Microsoft CEO Steve Ballmer "to spur Microsoft's long-held interest in acquiring the Patent Portfolio and to close the deal." Third, the Complaint points out that a

[2] AOL purchased Netscape Communications, the source of some of the patents, from Microsoft in 1998.

law firm publicly claimed that it began assisting AOL "when [it] began a program three and a half years ago to monetize patents through strategic patenting."

This information does not support the inference that AOL and Microsoft agreed to a secret, $1 billion transaction and then managed to hide it by engaging in a highly-publicized sham auction. It is unsurprising that a company like Microsoft would "follow" or "analyze" a patent portfolio as valuable as the one at issue here, especially during a time of intense activity in the patent market. The bare fact that a law firm began assisting AOL with "strategic patenting" in connection with general efforts to "monetize patents" three and a half years before the auction also does not support the theory that AOL and Microsoft had reached a secret deal in the fall of 2011. The Complaint does not allege that Microsoft was ever given access to nonpublic information, nor does it allege any facts supporting the theory that the $1.056 billion purchase price was set before the auction took place. The allegation that Armstrong placed one telephone call to Ballmer to "close the deal" is recklessly made without any factual support.[3]

[3] In response to the defendants' motion, the plaintiff identifies only an April 9, 2012 press report regarding Armstrong's description of the sale process as the source for the allegation. But, in that article, Armstrong described the process as a "full blown dynamic auction" in which the final buyer was not selected until April 5. Regarding his telephone

Plaintiff's reliance on Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(1), is also unavailing. Item 303 requires registrants to identify "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Id. The SEC's interpretive release regarding Item 303 explains that disclosure is required only "where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition." Securities Act Release No. 6835, 43 SEC Docket 1330 (May 18, 1989); Litwin v. Blackstone Group, L.P., 634 F.3d 706, 716 (2d Cir. 2011). As explained, the Complaint does not allege sufficient facts to support the theory that the terms of the patent sale were "presently known to management" before the auction, and defendants did in fact disclose that the patent portfolio was a valuable asset that might be sold.

In sum, the Complaint fails to plead with the requisite particularity that there was any material fact that AOL failed to disclose. Of course, AOL did not disclose that it had reached a deal to sell the patent portfolio to Microsoft for a

call to Ballmer, Armstrong said he had made the call to alert him "of the decision to sell the patents." No fair reading of the article suggests that a call was made to "close" a secret deal in advance of the auction.

set purchase price of more than $1 billion, but the Complaint does not adequately allege that these "facts" even existed. The Complaint's conspiracy theory is mere speculation. It contains no well plead allegations that render the theory plausible on its face. See Twombly, 550 U.S. at 570.

CONCLUSION

Defendants' February 1, 2013, motion to dismiss is granted. The Clerk of Court shall enter Judgment for the defendants.

SO ORDERED:

Dated: New York, New York
August 19, 2013

Denise Cote
DENISE COTE
United States District Judge