**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE AOL, INC. REPURCHASE OFFER
LITIGATION

12 Civ. 3497 (DLC)

ECF CASE

## LEAD PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO 15 U.S.C. § 78(u)-4(c)(1)

The Court, having dismissed the Amended Complaint in the above referenced action and entered judgment for defendants, makes the following findings pursuant to Federal Rule of Civil Procedure 11(b) ("Rule 11(b)"), as required by the Private Securities Litigation Reform Act ("PSLRA") 15 U.S.C. § 78u-4(c)(1).

### FINDINGS OF FACT

1.      On May 3, 2012, a class action complaint (the "Original Complaint" or "OC") was filed by Marilyn Rosenfarb, on behalf of herself and all others similarly situated, initiating this action for securities fraud against AOL, Inc. ("AOL" or the "Company"), Tim Armstrong ("Armstrong") and Arthur Minson ("Minson") (together, the "Defendants").

2.      The Original Complaint, signed and submitted by Ronald G. Rosenfarb (admitted *pro hac vice*) of the Rosenfarb Law Firm, alleged that Defendants failed to adequately disclose the Company's plan and activities to monetize its portfolio of legacy patents (the "Patent Portfolio") between August 11, 2011 and April 9, 2012 (the "Class Period"), violating Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and, with respect to Mr. Minson and Mr. Armstrong, violating Section 20(a) of the

Exchange Act.  The Original Complaint alleges that the Defendants failed to make required disclosures to the market regarding the Company's plan to sell its Patent Portfolio, thereby artificially depressing the price of the Company's common stock to the detriment of the putative class members who sold AOL stock during the Class Period, and to the benefit of the Company which was repurchasing its common stock off the market at the same time.  *See* Declaration of Ronald G. Rosenfarb, Sept. 16, 2013 at ¶ 9 ("RGR Decl.").

3.      The case was designated for inclusion in the Pilot Project Regarding Case Management Techniques for Complex Civil Cases in the Southern District of New York. Docket No. 2.

4.      Shortly thereafter, in mid-May, 2012, the Rosenfarb Law Firm approached attorneys at Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein") about the case, seeking a partner firm to prosecute the action.  Upon conducting its own investigation of the allegations in the Original Complaint, Wolf Haldenstein agreed to work with the Rosenfarb Law Firm on the action.

5.      On May 23, 2012, the parties entered a stipulation agreeing to adjourn Defendants' time to answer, move to dismiss or otherwise respond to the Original Complaint *sine die*.  Docket No. 8.  The parties later agreed to a new schedule, which was endorsed by the Court on June 8, 2012, providing members of the purported class until July 16, 2012, to move the Court to serve as lead plaintiffs, with opposition to be served by August 3, 2012, and a conference to be held at the Court's earliest convenience.

6.      The Rosenfarb Law Firm was contacted by a number of putative class members following announcement of the Action, including Barbara Keeling, a resident of Ireland, and Martin Schulthes, a resident of Italy.  RGR Decl. ¶ 6; Declaration of Peter C. Harrar, September

16, 2013 at ¶ 9 ("PCH Decl.").  Both individuals provided documentation of their sales of AOL common stock during the Class Period and corresponded with and discussed their roles with counsel.  RGR Decl. ¶ 6; PCH Decl. ¶¶ 9-10.

7.     On July 16, 2012, Wolf Haldenstein appeared in the case on behalf of Ms. Keeling and Mr. Schulthes, who moved the Court on the same day for appointment to represent the class as co-lead plaintiffs, and for appointment of Wolf Haldenstein and the Rosenfarb Law Firm as co-lead counsel.  Mr. Rosenfarb of the Rosenfarb Law Firm and Mr. Harrar of Wolf Haldenstein submitted detailed declarations in support of the movants' application.  RGR Decl. ¶ 7; PCH Decl. ¶ 11; *see* Docket Nos. 14-17.

8.     On August 10, 2012, the Court held an Initial Pretrial Conference, attended by counsel from Wolf Haldenstein and the Rosenfarb Law Firm, jointly representing the movants, and by counsel from Wachtell, Lipton, Rosen & Katz, representing Defendants.  Following the August 10, 2012, Initial Pretrial Conference, the Court issued a Case Management Order appointing Ms. Keeling as Lead Plaintiff, and Wolf Haldenstein as Lead Counsel.  Docket No. 18.  The Court ordered Lead Plaintiff to file an amended consolidated complaint by September 28, 2012.  *Id.*

9.     On September 28, 2012, Lead Plaintiff filed the Consolidated Securities Class Action Complaint (the "Consolidated Complaint" or "CC") on behalf of herself and all others similarly situated.  Daniel W. Krasner, Peter C. Harrar and Beth A. Landes of Wolf Haldenstein appeared on the Consolidated Complaint, which was signed by Mr. Harrar.

10.     Before composing the Consolidated Complaint, Lead Counsel engaged in extensive factual and legal research to determine the scope and nature of information available to

the public during the Class Period regarding AOL's stock repurchase program, AOL's Patent Portfolio, and AOL's alleged plan to sell the Patent Portfolio.  *See* PCH Decl. ¶ 8.

11.     The Consolidated Complaint alleged that during the Class Period, Defendants deceived AOL's selling shareholders by obscuring the true value of the Company's assets, the Company's intentions with respect to those assets, the Company's future prospects and the Company's liquidity.  Plaintiff charged that Defendants had taken several overt, but undisclosed, steps to sell AOL's Patent Portfolio, with Microsoft Corporation as the expected and favored buyer, for proceeds anticipated to be far in excess of the value at which the patents had been carried on AOL's books: $4 million.  The Consolidated Complaint alleged that Defendants' not disclosing their activity to monetize the Patent Portfolio to the market during the Class Period kept AOL stock at an artificially depressed price.  Doing so, the Consolidated Complaint alleged, effectively enabled Defendants to exploit the information imbalance through a stock repurchase program (the "Repurchase Program") that Defendants used to shrink the amount of outstanding AOL common stock by almost 14%, resulting in a significant boost to the value of their own stock portfolios when the truth came out about AOL's deal with Microsoft.

12.     The Consolidated Complaint made factual allegations, rooted in Lead Counsel's investigation, that, by no later than the Fall of 2011:

- AOL was engaged in a long-term strategy to monetize its Patent Portfolio (CC ¶¶ 27-29; *see gen.* OC ¶¶ 24, 25, 28; *see also* Amended Securities Class Action Complaint at ¶¶ 27-31 (filed Jan. 18, 2013) ("Amended Complaint" or "ACC");

- The Company sought and received authorization to sell the Patent Portfolio from AOL's Board of Directors (CC ¶ 32; OC ¶ 49; *see also* ACC ¶ 34);

- AOL committed to a plan to sell AOL's Patent Portfolio (CC ¶ 32 *et al.*; OC ¶ 28 *et al*; *see also* ACC ¶ 29 *et al.*);

- Defendants were aware of the Patent Portfolio's extraordinary undisclosed value (CC ¶¶ 25, 27; OC ¶¶ 21, 25; ACC ¶¶ 25, 28);

- AOL expected and encouraged Microsoft in particular to purchase the Patent Portfolio (CC ¶ 28, 31; *see also* ACC ¶¶ 28, 31);

- Microsoft had already embarked on its detailed review and due diligence with respect to the Patent Portfolio (CC ¶¶ 47, 58(b); OC ¶ 48; *see also* ACC ¶¶ 44, 55, 58, 61(b); and,

- Armstrong contacted Microsoft's CEO Steve Ballmer in the Fall of 2011 to spur Microsoft's long-held interest in acquiring the Patent Portfolio (CC ¶¶ 32, 36, 38, 42, 47, 52, 70; *see also* ACC ¶¶ 34, 38, 40, 44, 55).

13.    Additionally, Lead Plaintiff alleged that the timing and duration of the non-public auction AOL held at the end of the Class Period favored Microsoft and indicated that Microsoft was expected to be the winner all along.  CC ¶ 50; *see* ACC ¶¶ 53-55.

14.    The Consolidated Complaint alleged that Defendants were incentivized to withhold such information because doing so enabled AOL to repurchase its own stock at an artificially low price, removing 14% of the Company's float at a substantial premium.  CC ¶ 4; *see also* ACC ¶ 4.

15.     Defendants moved to dismiss the Consolidated Complaint on October 26, 2012. Plaintiff's memorandum in opposition was filed on November 28, 2012, along with a Declaration of Mr. Harrar bearing the same date.  In her Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Complaint (Docket No. 28) ("Memo in Opp. to MTD CC"), Plaintiff argued that Defendants were required to disclose their plan to monetize the Patent Portfolio, and to disclose its extraordinary value, based on, *inter alia*, the "disclose or abstain rule" of insider trading (*id.* at pp. 7-8), which applied because Defendants were trading in the market (through a repurchase program) while in exclusive possession of allegedly material information, giving Defendants an unfair advantage over sellers in the market.  Plaintiff also urged that disclosure was required as to events likely to affect the Company's liquidity pursuant to Item 303 of Regulation S-K, 17 C.F.R. § 299.303 (*id.* at 8-9).

16.     Plaintiff advocated in her Consolidated Complaint that the Defendants had made a number of misrepresentations, including by failing to disclose the true value of the Patent Portfolio and the alleged state of negotiations with Microsoft in the months preceding the Patent Portfolio's sale.   In her Memorandum in Opposition to Defendants' Motion to Dismiss the Consolidated Complaint, Plaintiff argued that the Court should not dismiss the claim for failure to plead that such misrepresentations were material unless the subject of the misrepresentations was so "obviously unimportant to a reasonable investor that" there could be no reasonable disagreement as to its unimportance.  Memo in Opp. to MTD CC at 11.

17.     On January 4, 2013, the Court ordered Plaintiff to advise the Court of Plaintiff's intent, if any, to amend the Consolidated Complaint.  On January 8, 2013, Plaintiff responded in the affirmative, and filed her Amended Complaint on January 18, 2013 (Docket No. 33).  The Amended Complaint made substantially the same allegations as the Consolidated Complaint,

with amplification or clarification of certain allegations that had been addressed in the initial motion to dismiss concerning motive, Microsoft's history of interest in the Patent Portfolio and AOL's stock price movements towards and at the end of the Class Period.  ACC ¶¶ 12-13, 34, 47-30, 32, 35, 44, 51-53.

18.     Defendants moved to dismiss the Amended Complaint on February 1, 2013, and Plaintiff opposed the Motion to Dismiss on February 15, 2013 ("Memo in Opp. to MTD ACC"). In her February 15, 2013, Memorandum in Opposition, Plaintiff urged that despite the disclosures the Company made in February and March of 2012, the Company continued to withhold from the market that in 2011: Defendants had already committed to a plan to monetize AOL's Patent Portfolio; the Patent Portfolio's extraordinary value; Microsoft was the expected purchaser of the assets; Microsoft's close review of the assets (after years of interest in them) was already underway; and that an asset sale was imminent.  Memo in Opp. to MTD ACC at 3, 9-10.   Defendants' claimed that in light of all the information available to the market— particularly third-party guesstimates as to the value of AOL's Patent Portfolio—withholding AOL's valuation of the Patent Portfolio did not amount to a material omission.  Plaintiff urged the Court that, "[t]hird party reports, which do not carry the authority of a Company's own statements, do not generally excuse a corporation of its duty to disclose material information." The key information here, Plaintiff argued, was only known to the Defendants – others were merely speculating.  Memo in Opp. to MTD ACC at 12-13.

19.     On August 19, 2013, the Court issued its Opinion and Order granting Defendants' Motion to Dismiss the Amended Complaint (Docket No. 41) ("Opinion & Order") and a second Order (Docket No. 42) requiring Plaintiff to make a submission regarding its compliance with

Federal Rule of Civil Procedure 11(b) ("Rule 11(b)") pursuant to the requirements of the Private Securities Litigation Reform Act of 1994 ("PSLRA").

## CONCLUSIONS OF LAW

1.      Upon final adjudication of an action arising under the PSLRA, the Court is required to make findings regarding compliance of the parties and their attorneys with Rule 11(b).  15 U.S.C. § 78u-4(c)(1); *see also ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 579 F.3d 143, 152 (2d Cir. 2009).  Although a Rule 11(b) analysis is only mandated at the conclusion of an action arising under the PSLRA, the Act "does not in any way purport to alter the substantive standards for finding a violation of Rule 11."  *ATSI Commc'ns.,* 579 F.3d at 152 (internal quotation omitted).  Rule 11(b) provides that:

> By presenting to the court a pleading. . . .an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1)    it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2)    the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3)    the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

Fed. R. Civ. P. 11(b); *see also Watkins v. Smith*, 12 Civ. 4635 (DLC), 2013 U.S. Dist. LEXIS 24712, at *11-12 (S.D.N.Y. Feb. 22, 2013).  Since a finding of "improper purpose" in violation of Rule 11(b)(1) is typically predicated on a finding of violations of Rules 11(b)(2) or 11(b)(3), that inquiry is addressed last.  *See e.g., Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 393 (2d Cir. 2003).

2.      The Second Circuit has "repeatedly held" that "Rule 11 'is targeted at situations where it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands.'" *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1993) (*quoting Associated Indem. Corp. v. Fairchild Indus.*, 961 F.2d 32, 34 (2d Cir. 1992) (additional internal quotations and citations omitted).  Indeed, "[t]he operative question is whether the argument is frivolous, *i.e.,* the legal position has 'no chance of success,' and there is 'no reasonable argument to extend, modify or reverse the law as it stands.'" *Fishoff v. Coty Inc.*, 634 F.3d 647, 654 (2d Cir. 2011) (*quoting Morley v. Ciba-Geigy Corp.*, 66 F.3d 21, 25 (2d Cir. 1995) (additional internal quotation marks omitted)).  Even a complaint wholly lacking in merit does not violate Rule 11 unless it is so faulty that the plaintiff's positions are "untenable as a matter of law." *In re Australia and New Zealand Banking Group Ltd. Sec. Litig.*, 712 F. Supp. 2d 255, 267 (S.D.N.Y. 2010) (*citing Salovaara v. Eckert*, 222 F.3d 19, 24 (2d Cir. 2000)).  Doubt as to whether or not a losing argument is sanctionable shall be resolved in favor of the signer of the pleading. *Dorchester Fin. Sec. v. Banco BRJ*, 02 Civ. 7504 (KMW)(KNF), 2010 U.S. Dist. LEXIS 59702, at *10 (S.D.N.Y. June 15, 2010) (*quoting Abdelhamid v. Altria Group, Inc.*, 515 F. Supp. 2d 384, 392 (S.D.N.Y. 2007)); *see also Rodick,* 1 F.3d at 1350.

3.      While the standard in determining whether a Rule 11 violation has occurred is objective reasonableness, "the extent to which a litigant has researched the issues and found some support for its theories even in minority opinions, in law review articles, or through consultation with other attorneys should certainly be taken into account." *Abdelhamid*, 515 F. Supp. 2d at 392 (*citing Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 166 (2d Cir. 1999) (*quoting* Rule 11 Advisory Committee Note)); *see, e.g., In re Australia*

*and New Zealand Banking Group*, 712 F. Supp. 2d at 267 (noting, in finding that an amended complaint did not violate Rule 11(b), that plaintiff made a "nonfrivolous argument for extending, modifying or reversing existing law" in part by virtue of its *attempt* to distinguish key authorities (emphasis added)).

## A.   PLAINTIFF'S FACTUAL ALLEGATIONS, ALTHOUGH FOUND INSUFFICIENT TO STATE A CLAIM, ARE SUPPORTED BY EVIDENCE

4.      "A statement of fact can give rise to the imposition of sanctions only when the 'particular allegation is utterly lacking in support." *Kiobel v. Millson*, 592 F.3d 78, 81 (2d Cir. 2010) (*quoting Storey*, 347 F.3d at 388); *see also Dorchester Fin. Sec.,* 2010 U.S. Dist. LEXIS 59702.  Plaintiff's factual contentions, while legally insufficient in total to give rise to an actionable claim, have evidentiary support in the public record.  That the Patent Portfolio was approved for sale in the Fall of 2011, AOL contacted Microsoft about the Patent Portfolio's availability during the same time-frame (Armstrong's self-reported call to Ballmer), and that Microsoft was investigating the contents of the patent portfolio in detail during the Class Period, are not in dispute.

5.      While the Court has found that the allegations, taken together, fall short of meeting the requirements for successfully pleading material misrepresentations on the part of Defendants, Plaintiff's allegations are not "utterly lacking in support," a necessary condition for finding a violation of Rule 11(b)(3).  To the contrary, the allegations presented in support of Plaintiff's claims are grounded in fact and Plaintiff's factual contentions are supported by direct and/or circumstantial evidence.

6.      To survive a motion to dismiss, a plaintiff is required to allege facts sufficient to "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  Pursuant to the heightened pleading standard imposed by Fed. R.

Civ. P. 9(b) and the PSLRA on claims for violation of Section 10(b) of the Exchange Act, a plaintiff alleging a material misrepresentation or omission must state the circumstances constituting fraud with particularity.  A plaintiff meets that requirement by "(1) specify[ing] the statements that the plaintiff contends were fraudulent, (2) identify[ing] the speaker, (3) stat[ing] where and when the statements were made, and (4) explain[ing] why the statements were fraudulent." *Saltz v. First Frontier, L.P.*, 485 F. App'x 461, 463 (2d Cir. 2012) (*quoting Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994) (internal quotation marks omitted)); *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 627 (S.D.N.Y. 2008) (*citing Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

7.    ***Misrepresentation and Omissions:***   In her Consolidated Complaint and her Amended Complaint, Lead Plaintiff specified the statements upon which her allegations of material misrepresentation were founded.  Lead Plaintiff alleged that Defendants omitted their plans with respect to the AOL Patent Portfolio from the Company's public disclosures.  In support, Lead Plaintiff cited the statements made by the Company and the statements made by Armstrong and Minson at investor conferences (*see infra* at ¶ 10).  Lead Plaintiff alleged that during the time those statements were made, the Defendants had developed and were implementing the Company's efforts to sell its Patent Porfolio—an allegation Lead Plaintiff bases on the Defendants' own post-sale statements.  (*See* ACC ¶ 34 *et al.*; CC ¶ 31 *et al.*; Nadia Damouni and Jenifer Saba, *Microsoft Trumps Amazon, others, for AOL Patent Portfolio*, *Reuters* (Apr. 9, 2012) (*see* PCH Decl., Exhibit F) (hereinafter, "Damouni & Saba, PCH Decl., Exhibit F").  Further, Lead Plaintiff alleged that Defendants had a heightened duty to shareholders at the time in light of the fact that Defendants were engaged in a publicly-announced Repurchase Program through which the Company purchased its shares off of the

market from holders who did not possess the same information about the Company's plans.  *See* ACC ¶¶ 50, 75; CC ¶ 57, 74; *see also* Memo in Opp. to MTD ACC at 7-8.

8.      If an allegation of material misrepresentation is made on information and belief, the plaintiff is required to "state with particularity all facts on which that belief is formed," 15 U.S.C. § 78u-4(b)(1), such that she demonstrates with specificity why and how the statement or omission is false and misleading.  *See Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

9.      Plaintiff's allegations were ruled insufficient to state a claim that the misstatements or omissions alleged were material.   Opinion & Order, p. 10.   While the allegations, taken together, fell short of meeting the requirements for successfully stating material misrepresentation on the part of Defendants, Plaintiff's allegation of material misrepresentation are not "utterly lacking in support."

10.      Plaintiff alleged that Defendants made material misrepresentations during the Class Period by failing to disclose its communications with Microsoft in its public statements and by asserting that Defendants were under a duty to disclose when they issued specified representations about the Company and the Repurchase Program without disclosing favorable and material non-public information.   The Consolidated and Amended Complaints identify alleged omissions of material fact in the representations made by Defendants in connection with the following:

- AOL Press Release, August 11, 2011, announcing Repurchase Program (ACC ¶¶ 32-34; CC ¶¶ 30-32; *see also* OC ¶ 27);

- Earnings Call, Third Quarter 2011, November 2, 2011, (ACC ¶ 35; CC ¶ 33; *see also* OC ¶ 29);

- AOL, Form 10-Q, Third Quarter 2011, (ACC ¶ 37; CC ¶ 34; *see also* OC ¶ 30);

- Armstrong statements, UBS Media and Communication Conference, December 5, 2011, (ACC ¶ 39; CC ¶ 37; *see also* OC ¶ 37);

- Letter to Starboard Value LP, December 21, 2011, (ACC ¶ 42; CC ¶ 40; *see also* OC ¶ 34);

- Minson statements, Needham Growth Conference, January 11, 2012, (ACC ¶ 43; CC ¶ 41; *see also* OC ¶ 35);

- Earnings Call, Minson Statements, February 1, 2012, (ACC ¶ 46, CC ¶ 44; *see also* OC ¶ 39);

- AOL, Form 10-K, filed February 24, 2012, (ACC ¶¶ 47-48; CC ¶¶ 45-46; *see also* OC ¶¶ 40-41);

- Armstrong statements, Barclay's Internet Connect Conference, March 13, 2012 (ACC ¶ 54; CC ¶ 51; *see also* OC ¶ 45).

11.     In addition, Plaintiff alleged a misstatement by Arthur Minson on January 11, 2012, at the Needham Growth Conference.  ACC ¶ 44; CC ¶ 42.

12.     ***Materiality***:   Lead Plaintiff contended that AOL's plans to sell the Patent Portfolio were concerted and definitive enough that the Company was required to disclose, pursuant to Item 303, the expected material change in its liquidity and that the discussion between Microsoft and AOL regarding the sale of the Patent Portfolio were material and should have been disclosed earlier in the Class Period.

13.     ***Contention That Defendants Took Material Undisclosed Steps to Monetize the Patent Portfolio During the Class Period.***  The bases of Plaintiff's factual allegation that the

Company sought and received authorization to sell the Patent Portfolio and embarked on a process to do so by the Fall of 2011 (ACC ¶¶ 34, 38, 40,44, 46, 49, 51, 66, 73; CC ¶¶ 32, 36, 38, 42, 47, 70, 73), include: (a) AOL's own statement of February 24, 2012, acknowledging "[w]e have a valuable patent portfolio and several months ago, prior to Starboard's first letter, the AOL Board of Directors authorized the start of a process, and hired advisors, to realize the value of these non-strategic assets" (ACC ¶ 51; CC ¶ 49); (b) a Reuters news article of April 9, 2012, reporting Armstrong's statements about the sale of the Patent Portfolio, including the statement that the sale process "started last fall after board approval" (Damouni & Saba, PCH Decl., Exhibit F); and (c) patent-counsel's statement on its website that AOL engaged patent-counsel roughly three years earlier to start the process of realizing the value of its intellectual property assets (ACC ¶ 31; *see also* CC ¶ 29); Executives' Guide to Patent Strategy: IP Monetization, Licensing, and Due Diligence, FINNEGAN, http://www.finnegan.com/ExecutivesGuideto PatentStrategyIPMonetizationLicensingandDueDiligenceJuly32012 (*see* PCH Decl., Exhibit H) (hereinafter, "Finnegan Statement, PCH Decl., Exhibit H").

14. ***Contention that AOL's Contact with Microsoft Represented Last Stage Of A Long-Held Strategy to Monetize the Patent Portfolio.*** Plaintiff alleged that Defendants were in fact engaged in a long-term strategy to monetize the Patent Portfolio—a strategy that began well before the Class Period, and which the Defendants were bringing to fruition during the Class Period. In support, Plaintiff alleged that Defendants were aware of the Patent Portfolio's enormous value for months if not years prior to the announcement of the Patent Portfolio's sale, which stems from Armstrong's own statement that he and his team specifically carved out the Patent Portfolio for AOL during his negotiations with Time Warner in 2009 during AOL's "spin-off" from its former parent company (ACC ¶¶ 28, 54; CC ¶¶ 27, 51); and the widely-reported

14

fact that by the second half of 2011, when the bidding on Nortel's patent trove closed and its sale was announced (June 30, 2011), Silicon Valley giants and the markets were on notice of the enormous defensive value of a patent trove like AOL's Patent Portfolio (ACC ¶¶ 26-27; CC ¶ 26).  The contention that AOL was engaged in a long-term strategy of which the negotiations with Microsoft only represent the closing phase is further supported by the fact that Defendants retained Finnegan Henderson in 2008 as patent-counsel, and by Finnegan's statement on its website that AOL began its program to monetize its patent portfolio more than three years prior to the April 9, 2012 sale.  ACC ¶ 31; *see also* CC ¶ 29; Finnegan Statement, PCH Decl., Exhibit H.  Plaintiff also focused on the structure, timing and duration of the auction held at the end of the Class Period as, she claimed, further evidence of Microsoft's favored status and seeming inevitability as the ultimate purchaser of the Patent Portfolio.  (ACC ¶¶ 56-59; *see also* CC ¶¶ 53-56).

15.   Given the long arc of these related events and the alleged material impact their closing had on the market and the Company's liquidity and prospects, Plaintiff had ample circumstantial evidence to conclude that the April 9, 2012, asset sale was the culmination of the Company's careful long-term strategy to monetize the Patent Portfolio as the market for its patents peaked, and to conclude that the activities undertaken during the Class Period represented the closing phase of AOL's plan to bring its Patent Portfolio to the market.

16.   Accordingly, Lead Plaintiff's contention that there were undisclosed activities in connection with efforts to bring about the sale of the Patent Portfolio during the Class Period is supported by allegations that are well-sourced, even though the allegations were ultimately deemed insufficient to state a claim because the Court did not find that, even taken as true, the events alleged were sufficiently far along in finalizing the deal so as to be material.

17.    ***Contention That Disclosure Prior to Announcement of Sale Was Not Sufficient To Inform Market of the Expected Change in AOL's Liquidity and Future Prospects.*** Plaintiff also asserted, clarifying in the Amended Complaint and in her Memorandum in Opposition to the Motion to Dismiss the Amended Complaint, that Defendants persisted in omitting allegedly material information even after Defendant's disclosure of February 24, 2012 and March 13, 2012.  Specifically, Plaintiff contended that the market still did not know, and could not have deduced, information which supported Plaintiff's allegations: that Armstrong called Ballmer after the Board authorized the sale of the Patent Portfolio, that Microsoft had been conducting a close analysis of the Patent Portfolio for months, and that Microsoft and AOL were in fact engaged in discussions that would culminate weeks later in the sale of the Patent Portfolio for more than $1 billion.  See Memo in Opp. to MTD ACC at 23-25.  Plaintiff's argument that the material information – the information valuable to the market – was not disclosed until the end of the class period is further circumstantially supported by the market's reaction on April 9th to the revelation of the sale and its price tag.  (ACC ¶¶ 62, 80-81; *see also* CC ¶¶ 59, 77-78.)

18.    The Court finds that Plaintiff's factual allegations are grounded in fact but do not rise to the level of material events that were required to be disclosed.  Indeed, the Court held that in light of the disclosures made in February and March of 2011, and the publicly available information about the value of AOL's Patent Portfolio throughout the Class Period, the Amended Complaint boiled down to whether the sales process was sufficiently far along during the Class Period that Defendants were required to disclose their dealings to the market, or whether "the information defendants possessed and withheld from the market" were "mere preliminary negotiations about a possible transaction."  Opinion & Order, p. 13.  However, although

ultimately insufficient to state a viable claim, the allegations are not utterly lacking in factual support.

## B.  PLAINTIFF'S LEGAL CLAIMS ARE GROUNDED IN CASE LAW

19.    "The fact that a legal theory is a long-shot does not necessarily mean it is sanctionable" as a Rule 11 violation.  *Fishoff*, 634 F.3d 647 at 654 (*citing Kropelnicki v. Siegel*, 290 F.3d 118, 131 (2d Cir. 2002)).  Where a plaintiff advocates extending existing law to the circumstances alleged, and the argument is "nonfrivolous," Rule 11 sanctions should not issue. *In re Australia and New Zealand Banking Group*, 712 F. Supp. 2d at 267.[1]  Here, it cannot be said that Plaintiff's legal claims and contentions were frivolous in violation of Rule 11(b)(2), even though the Court held that Plaintiff failed to state an actionable claim.  The Court held that Plaintiff ultimately failed to allege a material misstatement or omission as to AOL's failure to disclose the value of its Patent Portfolio in her Amended Complaint because AOL had disclosed, or the public otherwise had reason to know, that AOL considered the Patent Portfolio valuable. However, Plaintiff stated arguably colorable claims in reliance on existing case law and on reasonable arguments in favor of extending existing case law to the circumstances set forth in Lead Plaintiff's complaints.

---

[1]  In that case, the sanctionable complaint's central material allegation was that defendant knew knowledge of financial difficulties plaguing a major borrower in March 2007, and failed to disclose the information to the market.  The contention was drawn entirely from a single news article that plaintiff's attorneys misunderstood and failed to verify; under a plain reading of the news article, the contention was utterly unsupported because the relevant emails were dated March 2008, not March 2007, as plaintiff claimed.  The Court ruled that the assertion defendant possessed knowledge in March 2007 was "objectively unreasonable" where no evidence existed in support.  *In re Australia and New Zealand Banking Group*, 712 F. Supp. 2d at 264.  Here, plaintiff has not mistakenly alleged an untrue fact; instead, the question for the Court is whether Plaintiff's inferences are reasonable in light of the direct and circumstantial evidence it uncovered and pled, supported by existing law or a reasonable extension thereof.

20.     In a private action for violation of Section 10(b) of the Exchange Act, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008) (*citing Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-342 (2005)); *cited by Saltz v. First Frontier, L.P.*, 485 F. App'x at 463.

21.     ***Material Misrepresentations and Omissions***.  In its recent decision *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454 (2d Cir. 2013), the Second Circuit restated that "for an *omission* to be considered actionable under § 10(b), the defendant must be subject to an underlying duty to disclose." *Id.* at 465 (*citing Basic v. Levinson*, 485 U.S. 224, 239 n.17 (1988) (emphasis added)). Assuming such a duty exists, "a fact is to be considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares [of stock]."  *In re Stillwater Capital Partners Inc. Litig.*, 853 F. Supp. 2d 441, 452-53 & n.91 (S.D.N.Y. 2012) (*quoting Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92-93 (2d Cir. 2010) (additional citation and internal quotation marks omitted)).

22.     The Court held that in light of the partial disclosures made in February and March of 2012 and the market's reaction thereto, as well as the publicly available information about the value of AOL's Patent Portfolio throughout the Class Period, the Amended Complaint did not sufficiently plead the existence of material non-disclosures.  Opinion & Order, p. 13.

23.     However, Plaintiff made a number of non-frivolous arguments in support of her position that the information available to the public from third-party sources was no substitute

for disclosure of actual facts known to the Company.  Plaintiffs advocated that as defendant Plessy Co., in *Fisher v. Plessy Co.*, 559 F. Supp. 442, 447-48 (S.D.N.Y. 1983), was not excused from disclosing information it alleged to be in the public domain when Plessy, and only Plessy, possessed the critical facts, and accurate information was not readily available elsewhere, neither were Defendants.  Plaintiffs also cited *In re Seagate Tech. II Sec. Litig.*, 802 F. Supp. 271, 275 (N.D. Cal. 1992) for the position that disclosures by a defendant company about its business is rightfully treated differently by the market than speculation by third-parties about a defendant company's business.

24.     The claim that Defendants made material misrepresentations is grounded in, or based on an extension of, existing law:  Plaintiff provides ample legal authority to support its claim that the information withheld was material since the disclosure led to a substantial increase in the value of the stock price, indicating that the disclosure included facts which "may affect the desire of reasonable investors to buy, sell or hold a company's securities."  *SEC v. Shapiro*, 349 F. Supp. 46, 53 (S.D.N.Y. 1972); *see* Memo in Opp. to MTD ACC at 9-11.  Lead Plaintiff argued that the allegedly withheld or misrepresented information was "material" company-specific information that Defendants were required to disclose because the contacts with Microsoft went beyond the preliminary stage, and that the deal was not required to be final before disclosure was required under Item 303 and case law.  *See* Memo in Opp. to MTD ACC at 8 (*citing Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 716, 718-19 (2d Cir. 2011); distinguishing, at n.5, *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 279 (3d Cir. 2004) and *Phillips v. Kidder, Peabody & Co.*, 933 F. Supp. 303, 320 (S.D.N.Y. 1996)); *see also Basic Inc. v. Levenson*, 485 U.S. 224, 236 (1988); Memo in Opp. to MTD ACC at 9-13.

25.     **Duty to Disclose.**  Defendants here were alleged to have had a duty to disclose their plans to sell the Patent Portfolio during the Class Period under Item 303 of Regulation S-K, which requires certain filers with the SEC to identify in its 10-K and 10-Q filings any "known trends, demands, events or uncertainties" that are "reasonably likely" to result in a material change in the registrant's liquidity, financial condition or operational results.  ACC ¶¶ 67-70; CC ¶¶ 64-68; OC ¶¶ 50-54; *see* Item 303 (17. C.F.R. 229.303).  The claim of a duty to disclose was grounded on Plaintiff's argument in favor of extending existing law concerning insider-trading prohibitions to the circumstances of this case, where a similar information-imbalance exists between the purchaser of a security and its seller.  Memo in Opp. to MTD ACC at 7, n.5, analogizing *Alexandra Global Master Fund, Ltd. v. Ikon Office Solutions, Inc*., 06 Civ. 5383 (JGK), 2007 U.S. Dist. LEXIS 52546, at *25-26 (S.D.N.Y. July 19, 2007); *see also U.S. v. O'Hagan*, 521 U.S. 642, 670 (1997) (*quoting Chiarella v. United States,* 445 U.S. 222, 228 (1980).

26.     Plaintiff advocated that Defendants were subject to a heightened duty of disclosure in light of the Defendants' stock repurchase activities while in exclusive possession of information about the Company's plans to divest itself of its most valuable assets.  Plaintiffs sought to apply the "disclose or abstain" principle of insider trading to the circumstances of this case because Defendants stood to benefit – and the complaints alleged, did benefit – from the one-sided information dynamic at play while the Company repurchased its common shares from the market.  In her Memorandum in Opposition to Defendants' Motion to Dismiss the Consolidated Complaint, Lead Plaintiff avers that Defendants were required to disclose their plans to sell the Patent Portfolio, and to disclose its extraordinary value, based on, *inter alia*, the "disclose or abstain rule" of insider trading, which applied because Defendants were trading in

the market (through the Repurchase Program) while in exclusive possession of allegedly material information, giving Defendants an unfair advantage over sellers in the market. *See* Memo in Opp to MTD ACC at 10-11 (*citing Securities & Exchange Comission v. Shapiro*, 349 F. Supp. 46). Plaintiff also argued that the expected material change in liquidity gave rise to a duty to disclose pursuant to Item 303 of Regulation S--K, 17 C.F.R. § 299.303, as first alleged in the Original Complaint. While the Court disagrees that Defendants incurred any duty to disclose here or that any undisclosed information was material, it nevertheless finds that Plaintiff made non-frivolous arguments based on existing case law or an extension thereof.

27. *Scienter*. A plaintiff alleges scienter by "demonstrating that a defendant had the motive and opportunity to commit fraud or by providing evidence of conscious recklessness." *Saltz*, 485 F. App'x. at 463-64 (*citing South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108-09 (2d Cir. 2009)). In either case, the PSLRA requires that plaintiff state the facts giving rise to a strong inference of scienter with particularity. 15 U.S.C. § 78u-4(b)(2). Plaintiff has met her burden when a reasonable person, accepting the allegations as true and viewing them collectively, would "deem the inference of scienter at least as strong as any opposing inference." *Tellabs, Inc. v. Makor Issues  & Rights, Ltd.*, 551 U.S. 308, 326 (2007). Here, Plaintiff alleges that Defendants possessed a financial motive to commit the fraud, based on the Company's public filings, which establish that Armstrong and Minson were the two largest insider holders of Company stock (ACC ¶¶ 12, 13). Plaintiff's allegation of opportunity is not disputed; the Company was openly engaged in a Repurchase Program throughout the pendency of the Class Period.

28. Plaintiff relied on specific public statements made by the Defendants and financial analysis to allege that AOL saved more than $180 million by preventing the

information about the pending Deal from reaching the market.  The same evidence is behind Plaintiff's allegation that Armstrong and Minson were motivated to keep the information about the planned sale of the Patent Portfolio from the market since their large holdings would become proportionally more valuable as AOL removed almost 14% of its common shares from the market.  *See* ACC ¶¶ 4, 85; *see also* Memo. in Opp. to MTD ACC at 17-21.  Plaintiff colorably alleged that such benefits are "concrete" and "personal" pursuant to the Second Circuit's holdings in *Novak*, and that Defendants acted with a "specific goal" in mind: to depress the stock price during the pendency of the Repurchase Program in order to enrich themselves.   In light of the totality of the allegations, Plaintiffs allegations of scienter were not frivolous, even though the Court ultimately found that the inference of scienter was not more compelling than an opposing inference.

29.    ***Loss Causation***.   In *Loftin v. Bande* (*In re Flag Telecom Holdings, Ltd. Sec. Litig.*), 574 F.3d 29, 40 (2d Cir. 2009), the Second Circuit affirmed the loss causation analysis it set forth in *Lentell*: the plaintiff must allege a loss that is foreseeable, and must further allege that the loss is caused by the materialization of the concealed risk.  *Flag*, 574 F.3d at 40 (*quoting Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)).  In other words, a plaintiff is required to allege "that the misstatement or omission concealed something from the market that, when disclosed, [] affected the value of the security."  *Lentell*, 396 F.3d at 173 (*quoting Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)).

30.    Plaintiff looked to the reaction of the stock market upon the Company's disclosure on April 9, 2012, of the completion of the asset sale and its value.  The stock price jumped 43% in a single day.  Until April 9, 2012, Plaintiff alleged, the true value of AOL's assets; its intent to sell or license AOL's entire patent trove; the timing of the sale; the identity of

22

the buyer; the very existence of the allegedly robust and competitive auction; and AOL's true liquidity and future prospects, were undisclosed.  Plaintiff's claim of loss causation is not frivolous because a disclosure was made on April 9, 2012, which made "some part of a previously undisclosed truth known."  *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F.Supp. 2d 323, 347 (W.D.N.Y. 2008).  The Court found that the previously undisclosed information was not material before a final deal on price was reached.  However, since Plaintiff alleged, based on public statements, that AOL and Microsoft had been negotiating this deal for some time, it was not frivolous to argue that the market could have been informed earlier of the efforts to monetize the Patent Portfolio.

**C.    PLAINTIFF'S COMPLAINT WAS NOT BROUGHT FOR IMPROPER PURPOSE**

31.    There is no indication that the complaints or other pleadings filed in this action were presented for an improper purpose.  As discussed above, the factual and legal allegations made were not objectively unreasonable, and the legal allegations here could be argued to have been supported by statute or case law or a colorable extension thereof.  The record evidences that Plaintiff's counsel invested considerable time and effort investigating this action, which supports a finding that the action was not brought for improper purpose.

32.    A court may infer that pleadings are interposed for an "improper purpose" when, for example, a party persists in filing claims although "applicable preclusion doctrines… clearly foreclose further litigation," as in *Scott v. Major*, No. 89-CV-690, 1990 U.S. Dist. LEXIS 2364, at *4, (S.D.N.Y. March 6, 1990) (finding bad faith and intent to harass).  In the *Scott* action, the court held that Plaintiff's claims were barred by collateral estoppel and *res judicata*, and that "[a]fter cursory research, it should have been patently clear that [plaintiff's] claims had absolutely no chance of success under existing [state] precedents; moreover no reasonable

argument was or indeed could have been made to extend or modify New York law regarding preclusion." *Id*. at *3-4. Here, given the unusual fact pattern, securities law principles and specific case law—or colorable extension thereof—identified in the PCH Declaration, Plaintiff's arguments, though unsuccessful, were not objectively unreasonable. PCH Decl. ¶¶ 14-16.

33.     "Improper purpose" may be also inferred from circumstantial evidence, such as "excessive persistence in pursuing a claim or defense in the face of repeated adverse rulings." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 665 (11th Cir. Fla. 2010) (*quoting Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1448 (11th Cir. 1998) (*quoting Pierce v. Commercial Warehouse*, 142 F.R.D. 687, 690-91 (M.D. Fla. 1992))). Here, no merit ruling was issued before the Court's August 19, 2013, Opinion & Order.

## CONCLUSION

34.     Sanctions are unwarranted here because Plaintiff and her attorneys have not made any factual or legal assertions that are objectively unreasonable. A sanction under Rule 11(b)(3) is only appropriate where factual allegations are utterly lacking in support. Plaintiff and her attorneys have not violated Rule 11(b)(3) because the factual allegations presented to the Court in this matter are drawn from multiple sources that directly or circumstantially support her factual contentions, if insufficient as a matter of law to state claims. Plaintiff's allegations are not objectively unreasonable since they are not asserted in error or without factual basis, and Plaintiff had a reasonable basis to believe that additional evidentiary support for her allegations would be uncovered during discovery. Likewise, unless Plaintiff's legal claims are untenable as a matter of law--and unless her only arguments for application of current law to her claims are frivolous arguments--she has not violated Rule 11(b)(2). Plaintiff asserted colorable legal claims based on existing statutes, regulations and case law, or a reasonable extension thereof to the unique facts of this case, even though her pleadings were factually insufficient to meet the

burden of pleading materiality.   Finally, Plaintiff's claims have not been brought before this

Court for an improper purpose.

Dated: September 16, 2013                              Respectfully submitted,
New York, New York


                                                      WOLF HALDENSTEIN ADLER
                                                         FREEMAN & HERZ LLP

                                                      By: /s/ Peter C. Harrar
                                                            Peter C. Harrar    (PH -1689)
                                                            Beth A. Landes   (BL -1772)
                                                      270 Madison Avenue
                                                      New York, New York 10016
                                                      Telephone (212) 545-4600
                                                      Facsimile: (212) 545-4653